**NORTHLAND PAPER COMPANY, Inc., Plaintiff,**

v.

**MOHAWK TABLET COMPANY, Defendant.**

No. 66 Civ. 2517.

United States District Court S. D. New York.

April 5, 1967.

On Motion for Certification May 18, 1967.

Weisman, Celler, Allan, Spett & Sheinberg, by Milton Waxenfeld, New York City, for plaintiff.

Townley, Updike, Carter & Rodgers, by John Paul Reiner, New York City, for defendant.

## OPINION

TYLER, District Judge.

In this diversity action, defendant Mohawk Tablet Company ("Mohawk"), a Delaware corporation whose principal place of business and only plant are in Chicago Heights, Illinois, moves for an order dismissing the complaint for breach of contract by plaintiff Northland Paper Company, Inc., a New York corporation which has its principal office in New York City and a paper mill in Norfolk, New York.

Defendant moves pursuant to Rule 12 (b) (2), F.R.Civ.P., for dismissal because of lack of *in personam* jurisdiction on the ground that it did not transact business in New York State within the meaning of Section 302(a) (1) of the Civil Practice Law and Rules ("CPLR"), New York's jurisdictional "long-arm statute". Defendant also moves, pursuant to Rule 12(b) (4), F.R.Civ.P., for dismissal because of insufficiency of process upon it at its office in Chicago Heights, Illinois.

Because of the presence of issues of fact bearing on this jurisdictional question, a hearing was held on January 4, 1967, to adduce evidence on this aspect of the controversy. The following discussion incorporates the findings of fact and conclusions of law reached by the court as a result of that hearing.

## I. THE LOCUS OF THE NORTHLAND - MOHAWK NEGOTIATIONS

Section 302 of the CPLR provides, in relevant part:

"(a) Acts which are the basis of jurisdiction. A court may exercise personal jurisdiction over any non-domiciliary * * * as to a cause of action arising from any of the acts enumerated in this section, in the same manner as if he were a domiciliary of the state, if, in person or through an agent, he:

1. transacts any business within the state * * *." [1]

"Mohawk basically contends that it conducted no business in New York State which was related to the contract; specifically, Mohawk maintains that no part of the contract negotiations was conducted here. The validity of these arguments will be decided within the factual framework which is summarized below."

In the spring of 1965, Mohawk wanted to purchase some paper in order to fulfill its obligations under a government contract. On April 9, Alex Golden, then president of Mohawk, came to New York City to discuss a contract for the sale of the needed paper with Harry Zucker, who was vice-president of Monodon Paper Corporation. Golden proceeded to Zucker's office at 200 Park Avenue where he was introduced to Jerome Sonnenborn, who was president of Monodon.

---

1. Section 302(a) was amended, effective Sept. 1, 1966. It now provides, in pertinent part:

"(a) * * * As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nondomiciliary, * * * who in person or through an agent:

1. transacts any business within the state; * * *"

It is probable that the amended statute does not govern this action which was commenced prior to Sept. 1, 1966. A discussion of this question is not, however, warranted since the amendment has no substantive impact upon the case at bar.

Following negotiations, to be described and analyzed hereinafter, a contract was agreed upon by the three men and a written commitment for the sale was given to Golden.

When Golden returned to Chicago, he had one of his employees draw up a purchase order to "Monodon Paper Corporation". This order was subsequently sent to the offices of Zucker and Sonnenborn and represented the formal confirmation of the contract between Monodon and Mohawk. A few days later, however, Zucker called Golden and asked him to rewrite the purchase order to the "Northland Paper Company" instead of to Monodon. There was no discussion as to changes or possible changes in any of the terms and conditions set out in the original purchase order drawn to Monodon. The requested new order was duly drawn up and sent to Zucker as requested.

On the basis of these facts, defendant urges that the Northland-Mohawk contract, here sued upon, was not negotiated in New York. In essence, defendant contends that since the original purchase order written to Monodon was replaced by one written to Northland, which was, in fact, a wholly-owned subsidiary of Monodon, the court cannot take into consideration the April 9 negotiations among Golden, Zucker, and Sonnenborn in deciding whether or not this court has jurisdiction over Mohawk pursuant to Section 302(a) (1) of the CPLR.

Defendant's position is untenable because it seeks to have the court rule on a highly technical basis which gives form unwarranted pre-eminence over substance. It is clear that the contract in question here resulted from the negotiations of April 9. Conversely, it is clear that but for the April 9 talks among Golden, Zucker, and Sonnenborn, this contract would never have been consummated. The issuance of a second purchase order drawn to Northland rather than Monodon resulted in no alteration of the terms and conditions of the original contract nor was any modification mentioned when the subject of the second purchase order was discussed. Although the corporate identity of the selling firm was changed, the same men remained responsible for the formation and the execution of the contract. In sum, the substitution of Northland for Monodon had no practical or economic effect on the contract agreed to by Golden, Zucker, and Sonnenborn on April 9. Accordingly, there is no sound reason why it should have any legal effect.[2]

## II. THE "TRANSACTION OF BUSINESS" IN NEW YORK

■ An application of the plain meaning of Section 302(a) (1) of the CPLR suggests that the New York courts have jurisdiction over the case at bar. This conclusion is based upon the uncontroverted fact that an officer of the defendant corporation did come to New York to negotiate the terms and conditions of the contract which is the subject of this suit.[3] Such activity by defendant would apparently amount to a transaction of business within the state from which this cause of action arises.

An analysis of judicial interpretations of Section 302(a) by the New York courts indicates, however, that an application of the statute's plain meaning may not be appropriate. See, e. g., Kramer v. Vogl, 17 N.Y.2d 27, 267 N.Y.S.2d 900 (1966); Longines-Wittnauer Co. v.

---

2. In addition, there is a strong and obvious policy reason why the substitution of Northland for Monodon should have no effect on the question of the jurisdiction of this court under New York's long-arm statute. If defendant here were able to avoid the application of the statute, other out-of-state corporations and individuals might attempt to evade the jurisdiction of New York's courts by nego-

tiating under one name and then formally consummating a contract under another. It should be emphasized that no such attempt was made here, for defendant's claim arises from a substitution requested by the plaintiff, not the defendant.

3. The fact becomes "uncontroverted" as a result of the discussion in Section I, *supra*.

Barnes & Reinecke, 15 N.Y.2d 443, 261 N.Y.S.2d 8, 209 N.E.2d 68 (1965). Instead, the issue of jurisdiction should apparently be decided in terms of the totality of defendant's "purposeful activity" within the state which is related to the transaction of business in question. See Longines-Wittnauer Co. v. Barnes & Reinecke, supra; 1965 Supplementary Practice Commentary by Joseph M. McLaughlin, McKinney's CPLR § 302, 1966 Supp., pp. 69–75.

Since the issue must be decided in this context, it is necessary to summarize and analyze defendant's activities in New York which had a bearing on the contract here in question.

Prior to January, 1965, an invitation to bid on a government contract was published by the General Services Administration ("GSA") on behalf of the United States of America. The subject of the contract was the supply of paper writing tablets for use by government employees. Mohawk submitted a bid in writing and forwarded the same to GSA in New York City. Monodon also submitted a bid.

In January, 1965, the bids were opened in New York City and Mohawk was announced as low bidder. Mr. Alex Golden, then president of Mohawk, and Mr. Harry Zucker, then vice-president of Monodon, were physically present. Although the bidders were not required to attend the opening, they were able to get advance information, which would be of use for planning purposes, as to who would be the low bidder. In this sense, the presence of Mr. Golden at the opening of the bids amounted to the transaction of business which, as the following discussion will show, was related to the contract here in issue. Apparently, Golden and Zucker had no conversation *inter sese* which had any direct bearing upon the contract. (SM 18)

Thereafter, about the end of March or beginning of April, 1965, the GSA mailed an award of contract to Mohawk's offices in Chicago Heights, Illinois. On April 8, Zucker called Golden in Chicago and told him that he, Zucker, had learned of the award of the contract to Mohawk by GSA. Zucker stated that, since his company[4] had purchased a paper mill in upper New York State, it could supply the paper (in rolls) that would be required by Mohawk to fulfill the GSA contract. Zucker further asserted that his firm could manufacture the paper to government specifications. (SM 62–63). Golden responded to this information by telling Zucker that if the latter's company could supply the paper, he, Golden, would come to New York to negotiate the price.

On April 9, the day following the telephone conversation, Golden arrived in New York. He proceeded directly to Zucker's office at 200 Park Avenue where he met Zucker and Jerome Sonnenborn.

This meeting has already been described in part in the earlier section of this memorandum dealing with the locus of the Northland-Mohawk negotiations. Because of the meeting's critical bearing on the problem of transaction of business, the following discussion will describe the meeting in more detail.

Golden began his conference with Zucker and Sonnenborn at approximately 10:30 a. m. The formal conference lasted about two hours and was followed by lunch. During their conversations, the three men discussed, and ultimately agreed upon, all of the terms and conditions of a purchase by Mohawk of six thousand tons of paper. Those components of the contract specifically discussed were as follows: price, specifications, terms of delivery, terms of payment, and shipping requirements.

Defendant would have the court find that all components, except for price, had been agreed upon during the Zucker-Golden telephone conversation of the previous day. To a limited extent this is

4. Because of the corporate structure problem, discussed *supra*, the parties are at odds as to whether Zucker was representing Monodon or Northland at this point. In light of the foregoing resolution of this issue, a precise designation of representation is not crucial here.

true in that there is evidence that quantity and the ability of Northland (or Monodon) to meet the government specifications were discussed over the telephone. The fact that these items were further discussed and agreed upon during the conference shows, however, that they had not been finally settled over the phone. In addition, there is no evidence that the terms of delivery, payment and shipping were discussed in any way by telephone. While agreement on these particular items might have been dictated to some extent by trade practices, the items were necessary to the contract, and discussions about them must be given weight. Finally, the record shows that the most important element of this particular contract was price. Golden thought price to be so critical that he flew to New York to discuss it. I therefore find that since price was the focal point of these negotiations and since there is uncontradicted evidence that all negotiations relating to price were conducted in New York, this state is the situs of the negotiation of and agreement upon the basic and fundamental terms and conditions of this contract.

Following the conference and lunch with Sonnenborn and Zucker, Golden did not immediately leave New York; rather, he engaged in activity which amounted to a further transaction of business from which this suit arises. Specifically, Golden went to the offices of the GSA at Church Street in Manhattan. While there he gave to an employee a written commitment which he had obtained from Sonnenborn and Zucker during the conference. The commitment served the purpose of showing that Mohawk had a definite source of supply for the paper required under the contract. More important, however, while at GSA, Golden exercised Mohawk's prerogative and accepted the award of the contract. The acceptance was effected without any negotiations and no documents were signed.

Golden then left New York. Mohawk transacted no more business in this state in relation to this contract. The corporation's activities in Chicago Heights do, however, merit brief summary.

On April 13, a purchase order was sent to Monodon Corporation. This action formally confirmed the contract between Mohawk and Monodon. Subsequently, as described in Section I of this memorandum, another purchase order containing the same terms and conditions was sent to Northland, pursuant to Zucker's request. Subsequently, the contract entered the performance stage during which the problems which led to this breach of contract action developed.

Within this factual framework, the issue is whether Mohawk is subject to the jurisdiction of the New York courts as a result of the operation of Section 302(a) (1) of the CPLR. I hold that, as a result of an evaluation of the totality of the purposeful activity in this state of Alex Golden, Mohawk's ex-president, in relation to this contract, there is jurisdiction.

This conclusion is not easily reached in light of the fact that Golden was only physically present in the state twice when he transacted business relevant to this contract; moreover, each stay was of a very short duration. Thus, the case is unlike Longines-Wittnauer Co. v. Barnes & Reinecke, supra, where defendant conducted "substantial preliminary negotiations through high level personnel in New York during a period of some two months" in New York, 15 N.Y.2d at 457, 261 N.Y.S.2d at 19, 209 N.E.2d at 69, or Liquid Carriers Corp. v. American Marine Corp., 375 F.2d 951 (2d Cir. Feb. 28, 1967), in which "a high-level agent and officer of American Marine made three separate trips to New York over a period of two months to meet and negotiate with Liquid Carriers in connection with the contract involved in this suit." 375 F.2d at 956. It should be pointed out that one of these trips lasted for five days during which there were at least five or six separate meetings.

On the other hand, the controversy here is unlike that in Verner v. Moran Towing & Transportation Co., 258 F. Supp. 169 (S.D.N.Y. May 9, 1966) in

which "part of the contract negotiations, and an insubstantial part at that, took place in New York * * *." 258 F. Supp. at 172. In the instant case, it is my view that a substantial part of the negotiations took place in New York. This conclusion rests on the fact that all negotiations relating to the critical area of price were carried on in this state and most of the negotiations pertaining to other areas of the agreement were conducted here. In addition, of course, Golden's visits to GSA represent activities within the state other than those relevant to negotiations.

This latter consideration also distinguishes the case at bar from Irgang v. Pelton Crane Co., 42 Misc.2d 70, 247 N.Y. S.2d 743 (Sup.Ct.1964) in which the court apparently held that a "plaintiff must establish more than some discussion or negotiations prior to the contract" in order to invoke jurisdiction under Section 302(a) (1). 42 Misc.2d at 73, 247 N.Y.S.2d at 748; moreover, in that case, the "bulk" of the negotiations was conducted in North Carolina. Id. at 73, 247 N.Y.S.2d at 747.

The conclusion that there is jurisdiction is premised chiefly upon the fact that the critical part of the negotiations of this contract was conducted in New York. An analogous emphasis on this consideration is present in Liquid Carriers Corp. v. American Marine Corp., supra, in which the court stated that "[b]ecause of the nature of the negotiations involving * * * complex technical problems * * *, it is unlikely that the contract could have been negotiated otherwise than by * * * face-to-face meetings between the parties." 375 F.2d at 956. On the basis of the record before me, I do not believe that this contract could have been agreed upon but for the face-to-face confrontation over price. In this sense, defendant's presence in New York was a prerequisite to this contract. In view of the substantive importance of the New York negotiations, jurisdiction by this state's courts seem entirely proper.

From a quantitative point of view, jurisdiction seems equally well-grounded. The negotiations in New York touched upon nearly every aspect of the terms and conditions of the contract agreed upon by the parties. While there were some preliminary negotiations conducted during the telephone conversation of April 8, substantially all the various elements of this particular contract were discussed in New York. This fact should not be obscured by the finding that the negotiations were relatively uncomplicated and of short duration. *But see* 1965 Supplementary Practice Commentary by Joseph M. McLaughlin, McKinney's CPLR § 302, 1966 Supp., p. 71.

Finally, some emphasis must be placed upon the visits by Golden to the GSA offices in New York. It is apparent that neither visit was absolutely necessary to the procurement of the government contract; nevertheless, each visit was important and purposeful activity which had a relation to the contract here in question.

In sum, the purposeful activity of Golden while he was physically present in New York makes the defendant Mohawk subject to the jurisdiction of the New York courts under CPLR Section 302(a) (1). Defendant's basic motion to dismiss, therefore, must be and is denied. From this it follows that defendant's motion for dismissal on the ground of insufficiency of service also must be, and hereby is, denied.

It is so ordered.

### On Motion for Certification

Defendant's motion for an order pursuant to General Rule 9(m) of this court and 28 U.S.C. § 1292(b) is granted, subject, however, to the following considerations.

The granting of defendant's motion should not be construed as an imprimatur of the quoted language which defendant in its notice of motion asks this court to adopt as an addendum to the opinion and order of April 5, 1967. As I read the proposed language suggested by the defendant, it is slanted and argumentative;

worse, from the court's point at view, it seeks to recast the findings of fact embodied in this court's opinion, a step which I refuse to take.

 Nevertheless, although the matter is not free from doubt, I agree with defendant that one statutory prerequisite of an interlocutory appeal under Section 1292(b) is present in that the opinion of April 5th "involves a controlling question of law as to which there is substantial ground for difference of opinion". I accept as the debatable proposition of law this court's ultimate conclusion that defendant's "purposeful activity" in this state was of sufficient quality and quantity to confer upon a New York court jurisdiction of defendant's person under Section 302(a) (1) of New York's Civil Practice Law and Rules. For example, the defendant argues that certain visits by its former president to the General Services Administration's office in New York were not related to the contract here in suit. Defendant also argues that there is no authority for the conclusion that jurisdiction may be obtained in New York where one of its officers was in New York for only one day for contract negotiations. While I do not agree with these contentions, I believe that recent analyses, judicial and otherwise, of Section 302(a) (1) lend sufficient support to defendant's basic assertion that there is a substantial ground for differences of opinion as to the conclusions I reached in this case relating to the quantum and quality of defendant's purposeful activity in this state.[1]

With regard to the other statutory prerequisite of an interlocutory appeal, I find that an immediate appeal from this court's order of April 5th may materially advance the ultimate determination of this litigation. Obviously, if the appellate court should determine that such jurisdiction does not lie, the litigation in this court would be terminated at once.

Finally, I expressly exclude from certification defendant's argument that the contract was not negotiated in New York because a new corporate entity (Northland) was substituted for the old (Monodon). This contention is based upon a formalism and as such is without merit.

It is so ordered.

---

[1]. See, e. g., Liquid Carriers Corp. v. American Marine Corp., 375 F.2d 951 (2d Cir. February 28, 1967); Lumbermen's Mutual Casualty Co. v. Borden Co., 265 F.Supp. 99 (S.D.N.Y. Jan. 31, 1967); Verner v. Moran Towing & Transp. Co., 258 F.Supp. 169 (S.D.N.Y. May 9, 1966); Pallos v. Driv-Rite, Inc., 252 F.Supp. 582 (N.D.N.Y. April 2, 1966); 1965 Supplementary Practice Commentary by Joseph M. McLaughlin, McKinney's CPLR § 302, 1966 Supp., p. 71.