In the Matter of the Arbitration between
Herbert SOBEL, Petitioner,

v.

HERTZ, WARNER & CO., Respondent.

No. 71 Civ. 3534.

United States District Court,
S. D. New York.

Nov. 17, 1971.

On Motion for Reargument
Dec. 27, 1971.

---

3. Testimony reflected inspections by U.S.D.A., Campbell and Springdale at the Springdale plant.

Spear & Hill, New York City, for petitioner; by Francis E. Lake, Jr., New York City, of counsel.

Willkie, Farr & Gallagher, New York City, for respondent; by Mark F. Hughes, and Jack David, New York City, of counsel.

## OPINION

POLLACK, District Judge.

Petitioner seeks to vacate an arbitration award, pursuant to Section 10 of the Federal Arbitration Act, 9 U.S.C. § 10 (1971), on the ground that the award completely disregards petitioner's rights under the applicable provisions of the federal securities laws. It is argued that the arbitration panel's dismissal of petitioner's claims against respondent

was thus procured by "undue means", 9 U.S.C. § 10(a), and, additionally, is void because contrary to public policy.

When arbitrators undertake to determine a claim based on statutory law, the statutory rules set at least the boundaries within which they can act. A corollary of this duty to stay within the statute is a duty to include in the arbitration award some indication of the reasons for the decision, so that a Court may ascertain, if called upon to do so, that these boundaries were respected. In an arbitration of an issue touching on matters embraced within the federal securities laws, an award which fails to meet this minimum standard is for that reason alone subject to being set aside and resubmitted for clarification on the basis for the Award under §§ 10(d) and (e) of the Federal Arbitration Act.

Attempts to vitiate the substantive judgment of arbitrators are normally given a chilly reception by the Courts, in order to avoid weakening the vitality of arbitration as a valuable alternative to litigation. But when a claim of serious error is raised, it will not be dismissed out of hand. The Court has examined the record of the arbitration proceeding and the legal contentions proffered by the opposing parties, and, on the basis of its examination, it has concluded that the present state of the record is not sufficient to justify final determination of the issues petitioner has raised.

For the reasons discussed below, this matter is remanded to the arbitrators for an indication, now wholly lacking from the record, of the basis on which the petitioner's claim was dismissed.

## I.

This motion is one of a long series of attempts by disappointed arbitration claimants to persuade the federal courts to give substance to the statement by the Supreme Court in Wilko v. Swan, 346 U.S. 427, 436, 74 S.Ct. 182, 98 L.Ed. 168 (1953) that "manifest disregard" of the federal securities law by an arbitration panel could justify the vacating of that panel's award under the Arbitration Act. Petitioner's reliance on this language is heightened by the fact that the "law" with which the Court was concerned in *Wilko* was § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2) (1971), one of the bases for this proceeding.

The following seem to be the facts generating this controversy.

The petitioner, Herbert Sobel, was a customer of respondent, Hertz, Warner & Co.,[1] a stock brokerage firm which was a member of both the New York Stock Exchange and the American Stock Exchange. Sobel maintained a nondiscretionary margin account with Hertz, Warner from approximately mid-1965 to 1970.

Between December 7, 1965, and March 1, 1966, Sobel purchased 10,200 shares of the stock of Hercules Galion Products, Inc. ("Hercules"). The purchases were made by Edwin Wetzel, a registered representative and an Assistant Manager of the brokerage firm's Bronx branch office, at prices ranging from $10.00 to $14.50 per share; the total price of the stock, including commissions, was $132,961.

Sobel testified that he had "never heard of the company before these purchases were made." The first purchases, of 1,500 shares, were made with his approval. Thereafter, according to Sobel, Wetzel continued to acquire shares of the company without obtaining prior authorization from his client.[2] Sometime during late December or early Jan-

---

1. At the time of the events in controversy, the firm name was Hertz, Neumark & Warner. The firm ceased doing business in 1970 and is currently in liquidation.

2. Sobel was unable, however, to identify those shares whose acquisition he had not authorized. In all, 3,200 shares were purchased in December, 1965, 800 in January, 1966, 6,100 in February, 1966, and 100 on March 1, 1966.

uary[3] Sobel learned of the growth of his Hercules holdings and questioned the advisability of this heavy an investment. He testified that he was told by Wetzel "that it was a very, very good situation", that Hertz, Warner was buying shares of Hercules for its own account, and "that there was a lot of buying in this particular stock in Hertz, Warner." Wetzel also allegedly advised Sobel to liquidate other securities in his portfolio in order to take a heavier position in Hercules.[4]

Sobel did not object to the purchases. Moreover, he did not notify respondent that transactions had been made in his account without his approval.

During a visit to Hertz, Warner's offices made to deliver additional collateral for his margin account, Sobel was introduced to Michael Geier, another of respondent's representatives, whom Wetzel had previously identified as someone heavily involved in Hercules trading. It was apparently Geier who told Sobel of an "imminent merger" whereby Hercules would acquire the shares of Liquidonics Industries, Inc. ("Liquidonics"). Sobel also claimed to have been told by Geier that the merger was to be based on an exchange of one share of Hercules stock for two shares of Liquidonics stock.[5]

After March, 1966, the price of Hercules began to decline, reaching $9 per share in April and $5 per share in December, 1966. When Sobel sought the advice of Wetzel and Geier he was told that he should continue to hold the stock. Additionally, he claims to have been told by Geier at some point after the drop in price began that the Hercules-Liquidonics merger was a *fait accompli*, that the parties had "shaken hands" on it.[6]

Sobel asserted that this information about the possible merger and its terms was a factor in his decision to buy the shares. "That was one of the reasons I was so interested. The last purchase I think was 13½ or 14 on Hercules Galion, but Liquidonics was trading at that point about 10, and I could see that what would have to happen here is that Hercules Galion stock would have to be raised to at least double the value.[7] Obviously, a lot of buying was going on and the price of the stock had been going up."

On August 23, 1967, Wetzel and Geier were indicted in United States v. Projansky, et al., S.D.N.Y., 44 F.R.D. 550. Included among the defendants were two directors of Hercules Galion. The indictment charged a conspiracy to create market activity in the Hercules shares and to induce the purchase of the securi-

---

3. Sobel was unable to give definite dates for these conversations, other than to say that they occurred "toward the end of December, or January." [R. 23]

4. The letter of claim by which Sobel initiated the arbitration proceeding mentioned an additional representation, that "the value and price of the stock would rise * * * and be accentuated by the large volume of buying in the company's stock". Petitioner's Exhibit 1, at 4. While this text was read into the record by respondent's counsel, Sobel's testimony did not include recollection of such statement.

5. The chronology of these representations does not fully appear in the record. However, judging from a comparison of Sobel's testimony and the confirmation sheets for his purchases, it is likely that the conversation concerning the merger occur-

red at some point in the middle of February.

6. Again, there is a conflict as to chronology. While Sobel told the panel that he learned the merger had been finalized after March 1, 1966, his earlier statements implied that he had learned that the merger was set during the period when his purchases were still continuing. Without placing undue stress on this discrepancy, the significance of the merger to Sobel was presumably lessened once the fall in Hercules' price began.

7. On cross-examination, counsel for respondent attempted to seize on the phrase "to be raised" to imply petitioner's knowledge of or indifference to any manipulative market activity. Judging from the panel's own questioning, it does not appear that the arbitrators placed any emphasis on this phrase.

ty by others. Among acts in furtherance of the conspiracy, the government alleged sale of Hercules shares without disclosure of the facts (1) that secret compensation was being paid to securities salesmen in return for their reccommendation of the stock to customers and (2) that the price of the shares was in the process of being artificially raised. More specifically, Wetzel was charged with having been offered options to purchase Hercules shares below market price and with causing the purchase of 36,-850 Hercules shares in furtherance of the plan to create market activity and stimulate purchase of the shares by others.[8] Geier and a third Hertz representative, Murray Peltz, were alleged to have accepted and received payments of $25,000 each in return for their assistance and to have persuaded their customers to purchase 42,500 shares. Geier was also charged with inducing other salesmen to persuade their customers to purchase an additional 80,000 shares "by describing the business and operations of Hercules Galion * * * in optimistic terms [and] by assuring them that Hercules Galion was in the process of acquiring another company."[9]

On January 27, 1971, Wetzel pleaded guilty to the conspiracy charge. Geier was found guilty on all counts on June 5, 1971, after a jury trial.

Sobel discussed his transactions in Hercules with representatives of the New York Regional Office of the Securities and Exchange Commission during the summer of 1967 and answered a questionnaire from the Compliance Department of the American Stock Exchange on the same subject in May, 1967. He testified that it was not until the indictment was handed down that he "realized what had possibly happened" and contacted an attorney. Around the same date he complained, for the first time, to Hertz, Warner about the transactions.

Sobel requested resolution of his claim[10] by arbitration pursuant to Article VIII of the Constitution of the New York Stock Exchange in a letter of claim filed on November 27, 1967[11]. He continued to hold his Hercules shares until Hertz, Warner demanded in connection with the arbitration that the shares be sold in order to fix damages. This was done on May 22 and 23, 1968.[12] After the sale, Sobel claimed a net loss on the Hercules venture of some $34,-000.[13]

8. Count three of the indictment alleged the actual completion of transactions on the American Stock Exchange by Wetzel, among others, during the period November 30—December 9, 1965. During that period, 2,200 shares were purchased for Sobel's account. (An additional 1,000 shares were purchased for him between December 10 and December 13.) Geier was charged in Count four with effecting similar transactions during the period February 4, 1966 to February 16, 1966. While Wetzel was not named in this Count, it may be noted that 6,000 shares were purchased for Sobel on February 15 and 16, 1966.

9. According to the bill of particulars, Wetzel was not one of these other salesmen. The indictment, the bill of particulars, and the transcript of Wetzel's subsequent plea of guilty to the conspiracy charge were submitted to the arbitration panel.

10. The Hercules claim was one of two submitted for arbitration. The second claim concerned Sobel's purchases on the advice of Wetzel and Geier of shares of Ameco Corp. No appeal is taken from the arbitrators' decision involving this second series of transactions.

11. Although the transactions in Hercules had occurred on the American Stock Exchange, the controversy was arbitrable under New York Stock Exchange rules as a controversy between a member firm (Hertz) and a non-member, submitted to arbitration by the non-member. New York Stock Exchange Constitution, Article VIII, § 1.

12. 11,479 shares were sold, the difference being attributable to stock dividends received during the holding period of the Hercules shares.

13. It is not clear whether this net loss figure excluded the additional 1,479 shares sold.

Sobel's claim was heard by a panel of five arbitrators.[14] The panel held two hearings, on February 2, 1971 and April 20, 1971, at which it heard the testimony of Sobel, Henry Warner (a partner in Hertz, Warner & Co.), and William Bernstein, an attorney who had represented Liquidonics in its merger negotiations with Hercules. In addition, documentary evidence was submitted by both parties.[15]

On May 12, 1971, the panel issued the following decision: "[H]aving heard and considered the proofs of the parties, [we] have decided that the claim of the claimant be and hereby is in all respects dismissed."[16] Sobel requested that the matter be reopened after Geier's conviction, but the request was denied on the ground that no provision of the Exchange's arbitration rules provided for reopening an arbitration judgment on such grounds.

## II.

Petitioner chose to arbitrate the federal and state law claims arising out of an alleged fraud in the sale of securities to him. However, he contends here that the decision of the arbitrators must have completely ignored the statutory prohibitions of the federal securities laws, specifically §§ 12(2) and 17(a) of the Securities Act of 1933, 15 U.S.C. §§ 77*l*(2) and 77q(a) (1971), § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1971), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 (1971).

Respondent naturally asserts that petitioner's factual claims and legal assumptions were placed in issue directly and that the arbitrators had ample evidence before them to justify a finding that plaintiff failed to establish his claim. The brokers claim that the record fails to evince such "disregard" of the law as would justify invoking the Arbitration Act to vacate the award.

As indicated above, petitioner has relied primarily on Wilko v. Swan to support his formulation of the Court's scope of review of the arbitration proceeding here involved. In *Wilko*, the customer of a brokerage firm alleged that he had been induced to purchase shares by the firm's misrepresentations and brought an action to recover damages under § 12 (2) of the '33 Act.[17] The customer had signed a margin agreement which included a provision requiring arbitration of any controversy which might arise out of his account, and the brokers moved to stay the lawsuit pursuant to § 3 of the Arbitration Act. The stay was held proper by the Court of Appeals. 201 F.2d 439 (2d Cir. 1953). The Supreme Court reversed, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), holding that an agreement to arbitrate future controversies was a waiver of the plaintiff-

14. Pursuant to Section 6 of Article VIII of the Exchange Constitution, Sobel elected to have the case heard by persons selected at random from the Exchange's two panels of arbitrators rather than by members of the Exchange's own Board of Arbitration. His case was thus determined by two arbitrators "engaged in the securities business" and three arbitrators from other fields.

15. Insofar as the Hercules claim was concerned, petitioner's documentary evidence included two memoranda of law, copies of the indictment and bill of particulars in United States v. Projansky, *supra*, a transcript of the proceedings during Wetzel's guilty plea, records of Sobel's Hercules purchases, and a copy of an April, 1967, Wall Street Journal arti-

cle concerning investigations into the Hercules affair. Respondent submitted a reply memorandum of law and a copy of a memorandum of agreement between Hercules and Liquidonics, dated January 26, 1966, discussing terms for a proposed merger of the two companies. The memorandum stated that the exchange ratio for the merger was to be one share of Hercules for each two shares of Liquidonics.

16. Costs of $240 were assessed against Sobel.

17. The alleged misrepresentations involved failure to inform plaintiff that a director of the company whose shares he had been advised to buy pending a merger had simultaneously been selling shares; including some of those the plaintiff purchased.

customer's right to have his claim heard in a federal or state court, § 22(a), 15 U.S.C. § 77v(a), which § 14 of the Act, 15 U.S.C. § 77n, was designed to prevent. The Supreme Court rejected the brokerage firm's contention that arbitration in this context was merely another "form of trial", 346 U.S. at 433, 74 S. Ct. 182, to be utilized in place of trial at law.

Although the Second Circuit had granted a stay of litigation because an agreement to arbitrate existed, it noted that the margin agreement was by its terms subject to the provisions of the securities laws and consequently a "failure to * * * decide in accordance with the provisions of section 12(2) * * * would * * * constitute grounds for vacating the award" pursuant to § 10 of the Arbitration Act. 201 F.2d at 445. The Supreme Court agreed that "in so far as the award in arbitration may be affected by legal requirements, statutes or common law, rather than by considerations of fairness, the provisions of the Securities Act control." 346 U.S. at 433–434, 74 S.Ct. at 186. The Court pointed out further that while interpretations of law by arbitrators are not subject, in the federal courts to judicial review for error in interpretation, the standards of the securities acts must not only be determined but must be applied by the arbitrators.

Power to vacate an award is limited. *While it may be true*, as the Court of Appeals thought, *that a failure of the arbitrators to decide in accordance with the provisions of the Securities Act would 'constitute grounds for vacating the award pursuant to section 10 of the Federal Arbitration Act', that failure would need to be made clearly to appear.* In unrestricted submissions, such as the present margin agreements envisage, the interpretations of the law by the arbitrators *in contrast to manifest disregard* are not subject, in the federal courts, to judicial review for error in interpretation. * * * [The standards of the Act] must be not only determined but applied by the arbitrators without judicial instruction on the law. As their award may be made without explanation of their reasons and without a complete record of their proceedings, the arbitrators' conception of the legal meaning of such statutory requirements as 'burden of proof', 'reasonable care' or 'material fact' * * * cannot be examined.[18] 346 U.S. at 436–437, 74 S.Ct. at 187–188 (emphasis added)

The major factor distinguishing *Wilko* from this case is that the former dealt directly only with the question whether a prior agreement to arbitrate could bind a securities act claimant.[19]

18. *Compare* with these statements, Justice Frankfurter's dissent: "Arbitrators may not disregard the law. Specifically they are, as Chief Judge Swan pointed out, 'bound to decide in accordance with the provisions of section 12(2).' On this we are all agreed. It is suggested, however, that there is no effective way of assuring obedience by the arbitrators to the governing law. But since their failure to observe this law 'would * * * constitute grounds for vacating the award pursuant to * * * the Federal Arbitration Act' * * * appropriate means for judicial scrutiny must be implied, in the form of some record or opinion, however informal, whereby such compliance will appear, or want of it will upset the award." 346 U.S. at 440, 74 S.Ct. at 189. As discussed below, the Court in this proceeding adopts Justice Frank-

furter's suggestion that if "manifest disregard" is to have any meaning, some obligation for statement of reasons is placed upon the arbitrators.

19. All of the opinions in both the Court of Appeals and the Supreme Court in *Wilko* refrained from any ruling on the enforceability of agreements to arbitrate "presently-existing" Securities Act controversies. *See* 346 U.S. at 438, 74 S.Ct. 182; 201 F.2d at 446 (Clark, J. dissenting). The validity of such a submission under the '34 Act has since been upheld by the federal courts. See, *e. g.,* Moran v. Paine, Wabber, Jackson & Curtis, 389 F.2d 242, 245 (3d Cir. 1968), *aff'g* 279 F.Supp. 573 (W.D.Pa.1967) and thus, at least implicitly, under the '33 Act as well, *cf.* Reader v. Hirsch and Co., 197 F.Supp. 111, 117 (S.D.N.Y.1961).

Here the petitioner's selection of arbitration was voluntary; there is no suggestion that it was in any manner compelled by the respondent. In effect, petitioner asks the Court to take from *Wilko* recognition of the need to insure an effective judicial review of the arbitrators' application of the Securities Acts consistently with the statutory protection afforded buyers of securities.[20]

At issue here is not the general proposition that in some circumstances disregard of law might invalidate an award, but the circumstances which constitute manifest disregard of the law and the extent to which a reviewing Court can legitimately search them out in the arbitration record. The Courts have struggled with the potential meaning of the concept since 1953 without notable success.

This Circuit's most complete review of the standard for examination of an arbitration decision occurred in Saxis Steamship Co. v. Multifacs International Traders, Inc., 375 F.2d 577 (1967).[20A] The Court of Appeals refused to overturn an arbitration panel's ruling that a third party to a charter agreement had been a subcharterer of the claimant and that consequently the charterer was not entitled to offset against an award for the owner the damages to the third party caused by the owner's own breach.

[I]t is the function neither of this court nor of the district courts to review the record of the arbitration proceeding for errors of law or fact. [citing cases] * * * In addition to the specific proscriptions of 9 U.S. C. § 10, the Supreme Court has held in Wilko v. Swan [,supra, 346 U.S. 436, 440, 74 S.Ct. 182,] that an award, based on "manifest disregard" of the law, will not be enforced; but this presupposes "something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law." [citing San Martine Compania de Navegacion v. Saguenay Terminals Ltd., 293 F.2d 796, 801 (9th Cir. 1961) discussed immediately, *infra*]. Any such exception must be severely limited, because extensive judicial review frustrates the basic purpose of arbitration, which is to dispose of disputes quickly and avoid the expense and delay of extended court proceedings. 375 F.2d at 582.

*Saxis*, however, leaves open the crucial question of the distinction between a mere error of law and that manifest disregard of the law which would entitle the Court to insert itself between the arbitration panel and the parties whose claims it judged. In *Saguenay Terminals, supra,* the Ninth Circuit, focusing

The opinion of the Supreme Court of Pennsylvania in the *Moran* litigation, 422 Pa. 66, 68–69, 220 A.2d 624, 626–627 (1966) specifically held that such a submission of a '33 Act claim was valid. In Pearlstein v. Scudder and German, 429 F.2d 1136 (2d Cir. 1970), cert. denied 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550, Judge Waterman commented, by way of dictum, that arbitration was "a desirable end * * * easily compatible with the broad purpose" of the '34 Act. 429 F.2d at 1143.

20. The possibility of such a need was explicitly recognized by Justice Jackson in a brief concurring opinion: "I think * * * the parties could agree upon arbitration [after a claim arose]. However, I find it unnecessary in this case, where there has not been and could not be any arbitration, to decide that the

Arbitration Act *precludes any judicial remedy for the arbitrators' error of interpretation of a relevant statute.* 346 U.S. at 438–439, 74 S.Ct. at 189 (emphasis added) The italicized portion suggests the difficulty of drawing a line separating "manifest disregard" from "error of interpretation."

20A. In Trafalgar Shipping Co. v. International Milling Co., 401 F.2d 568 (2d Cir. 1968) the Court of Appeals held that whether laches on the part of the party seeking arbitration voided the arbitration agreement was a question initially for the arbitrators themselves. The Court commented that "[in] any event, an arbitration award is subject to review in the courts for 'misbehavior' of the arbitrators * * * or 'manifest disregard of the law.'" 401 F.2d at 572–573.

on the "trouble" caused by the phrase "manifest disregard", rejected a "degree of error test".[21] Instead, it observed that "a manifest disregard of the law * * * might be present when arbitrators understand and correctly state the law, but proceed to disregard the same." 293 F.2d at 801.[22]

The Supreme Court has offered no further explication of its language in *Wilko*. In Bernhardt v. Polygraphic Co. of America, 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956), Justice Douglas stated for the Court that "[a]rbitrators do not have the benefit of judicial instruction on the law; they do not need to give reasons for their results; the record of their proceedings is not as complete as it is in a court trial; and judicial review of an award is more limited than judicial review of a trial— all as discussed in Wilko v. Swan." 350 U.S. at 203, 76 S.Ct. at 276. Prima Paint Corp. v. Flood and Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L. Ed.2d 1270 (1967) held that an asserted issue of fraud in the inducement of a contract containing an arbitration clause was an issue for the arbitrators, "honor- [ing] * * * the unmistakably clear congressional purpose that the arbitra- tion procedure, when selected by the parties to a contract, be speedy and not subject to delay and obstruction in the courts." 388 U.S. at 404, 87 S.Ct. at 1806.[23] The Court's decision unfortunately made no mention of Wilko v. Swan.

The problems faced by a Court asked to review an arbitration award are especially acute where the underlying controversy is based on duties created by statute rather than on commercial problems whose legal basis is judge-made law. The rules and categories of the common law are themselves general formulations and when the parties ask an arbitrator rather than a Court to apply these rules they neither expect nor. seek a resolution strictly based on legal subtleties.[24]

A complicated statutory scheme such as that of the Securities Acts presents a different picture. First of all, the statute specifically delineates legal duties. And even where the operative statutes are general or ambiguous—as is the case with § 12(2) of the '33 Act and especially § 10(b) of the '34 Act—case law and administrative interpretation may have expanded and illuminated˙ statutory meaning. Moreover, the duties created

21. "Conceivably the words may have been used to indicate that whether an award may be set aside for errors of law would be a question of degree. Thus if the award was based upon a mistaken view of the law, but in their assumption of what the law was, the arbitrators had not gone too far afield, then, the award would stand; but if the error is an egregious one, such as no sensible laymen would be guilty of, then the award could be set aside. Such a 'degree of error' test would, we think, be most difficult to apply. Results would likely vary from judge to judge. We believe this was not what the court had in mind when it spoke of 'manifest disregard.'" 293 F.2d at 801 n. 4.

22. In Fukaya Trading Company, S.A. v. Eastern Marine Corp., 322 F.Supp. 278 (E.D.La.1971), the Court examined the law regarding a charterer's duty to designate a berth for the vessel chartered. Noting some conflict in the admiralty law itself as well as the fact that the arbitration agreement had specified that the arbitrators were to be "men of commerce", the Court was "not prepared to say that the three arbitrators unanimously acted in 'manifest disregard of the law.'" 322 F.Supp. at 284. See also, Auxiliary Power Corporation v. Eckhardt & Co., 266 F. Supp. 1020, 1023 (S.D.N.Y.1966) (Tyler, J.) (arbitrators' specific finding that German court determination had not reached merits and was not res judicata could not be said to constitute "manifest disregard".).

23. Justice Black's dissent complained that "the arbitrators who the Court holds are to adjudicate the legal validity of the contract need not even be lawyers, and in all probability will be nonlawyers, wholly unqualified to decide legal issues, and even if qualified to apply the law, not bound to do so." 388 U.S. at 407, 87 S.Ct. at 1808.

24. See American Almond Products Co. v. Consolidated Pecan Sales Co., 144 F.2d 448, 451 (2d Cir. 1944).

by statute are the product of a legislative judgment about the desirability and form of public intervention in given circumstances and may be felt therefore to require vindication even under the flexible standards of arbitration.

The arbitrator's discretion is thus potentially confined at the same time as a disappointed claimant has both a more specific peg on which to hang an argument that the law has been misconstrued and a claim that, because a statutory policy is involved, the error is somehow more serious than it might be in the more usual commercial context.

This is the substance of the reasoning behind petitioner's claim for relief. However, even if §§ 12(2) and 17(a) of the '33 Act and 10(b) of the '34 Act create the matrix within which the arbitrators must function, statutory language is never sufficient by itself to resolve a given controversy. Decision requires the application of law to a particular grouping of facts and relationships. Here those relationships involve an investor, his "customer's man" for almost two decades and the brokerage house for whom the representative worked when the Hercules transactions occurred. The arbitrators were asked to consider the character of a set of representations not as abstract statements but on the basis of their meaning under the circumstances in which they were made.

### III.

■ On the basis of the present record, this Court is not prepared to analyze the arbitrators' final judgment, which must necessarily include resolution of a number of issues of fact and law, as well as questions of the weight to be afforded the testimony heard, to see if the decision "manifestly disregards" the rules of the 1933 and 1934 Securities Acts. Indeed, it lacks the one element most necessary to enable it to do so, namely, any indication of the facts on which the arbitrators based their decision. It is true that Courts have generally been wary of setting standards for the content of an arbitration decision, for fear of unduly limiting or harming the flexibility of judgment and analysis which is the key value of arbitration. However, the arbitrators' discretion in framing their award cannot be wholly without limits. In a case such as this, which necessarily involves both public and private interests over which the Courts and Congress have labored for the past thirty-seven years, some indication of the grounds for the arbitrators' judgment is required if their decision is to have the effect which defendant would implicitly have the Court confirm, the barring of petitioner's claims. See Moran v. Paine, Webber, Jackson & Curtis, n. 19 *supra*, 279 F. Supp. at 581–582; 389 F.2d at 246.

■ While it is certainly true and relevant that petitioner was not forced to arbitration, it is also the case that the arbitrators were not compelled to accept the responsibility for resolving this claim.[25] Moreover, the policies of Congress and the Courts favoring arbitration place responsibilities upon the arbitrators themselves. Regardless of the validity of their ultimate determination, or the scope of judicial review of their decision—matters upon which the Court expresses no opinion in either direction—this judgment is defective because it lacks *any* indication of its basis in the facts of the controversy.

Public confidence in the arbitral process—vital to all arbitration—is especially important as an impetus to the submission of existing disputes to arbitration where there is no pre-existing contractual obligation to by-pass the Courts. If arbitrators were to resolve even relatively simple disputes, to say nothing of

---

25. There is no indication in the Constitution or arbitration rules of the New York Stock Exchange that its acceptance of a claim for arbitration between a customer and a brokerage house is mandatory. Section 7 of Article VIII of the Constitution states that "the Board of Governors may decline in any case to permit the use of the arbitration facilities of the Exchange pursuant to this Article."

the complex technical controversies in which the arbitrator's experience and skill is most valuable, by merely a statement of final conclusion without the briefest explanation of the reasons for that result, disputants might come to fear, legitimately or not, that the failure to give reasons indicates indecision on the part of their selected "judges". It is true that parties who choose arbitration do not expect a "legally perfect result"; however, they do expect a rational result to the best of the arbitrators' judgment, and a mere dismissal may fairly cast doubt upon the legitimacy of that expectation.

■ There is a far more serious reason, however, why this judgment must be resubmitted to the arbitration panel. The absence of any explanation from the panel imposes an impediment to limited review of the decision, which both parties concede is within the Court's province.

Petitioner, perhaps relying on the suggestion in *Saguenay Terminals, supra,* 293 F.2d at 801, suggests that "manifest disregard of the law" would constitute "undue means" in the procurement of the award. However, at this intermediate stage in the proceeding, this Court inclines toward the view, adopted by the Court of Appeals in Amicizia Societa Navegazione v. Chilean Nitrate and Iodine Sales Corporation, 274 F.2d 805, 808 (2d Cir.), cert. denied, 363 U.S. 843, 80 S.Ct. 1612, 4 L.Ed.2d 1727 (1960) (Clark, J.) that *Wilko's* identification of "manifest disregard" as grounds for vacating an award rested on the language of 9 U.S.C. § 10(d), authorizing the voiding of an award if the arbitrators "exceeded their powers".

■ Although both *Wilko* and *Bernhardt* contain language to the effect that arbitrators need not give reasons

for their decision, that issue was not before the Court in either case. If there are some legal boundaries which arbitrators may not overstep in determining their result, then the logical corollary, as Justice Frankfurter suggested in *Wilko,* n. 18 *supra,* is that the Courts must be furnished some means in the arbitrators' decision, however informal, for determining that those boundaries have not been transgressed. Otherwise, the Courts would be left to guess at the reasons for a result on the basis of the bare record, and, in light of their limited scope of review, could never do more than assume that the arbitrators had chosen a proper rationale.

In the field of labor arbitration, the Courts have consistently indicated that, while the area of the arbitrators' discretion[26] is wide and that of judicial review limited, there are bounds beyond which the arbitrators may not go. The arbitrator is bound by the "four corners" of the collective bargaining contract under which the submission took place. "When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem * * * Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. *When the arbitrator's words manifest an infidelity to this obligation,* courts have no choice but to refuse enforcement of the award." United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358,

---

26. *See, e. g.,* United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S.

574, 581–582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).

1361, 4 L.Ed.2d 1424 (1960) [27] (emphasis added).[28]

Here, there is no disagreement that the arbitrators were as least bound to observe "the four corners of the securities laws",[29] and when their "words" are insufficient to indicate that they stayed within those bounds, a District Court is justified in requiring some statement of the facts the arbitrators found decisive. To hold otherwise would allow complete insulation of an arbitration result from any meaningful review —a result which this Court is not prepared to accept as within the contemplation of either the Congress or the Supreme Court.[30]

Moreover, while the Courts have consistently stated their displeasure with litigant's attempts to obtain "a second bite of the apple" through judicial review of arbitration results, it is noteworthy that disposition of such appeals most often includes a comparison of the arbitrators' findings with the evidence and legal material before them. Indeed, in South East Atlantic Shipping Ltd. v. Garnac Grain Co., Inc., 356 F.2d 189 (2d Cir. 1966), where the Court found the appeal so devoid of merit that it imposed damages under the then Rule 26(b) of the Rules of Court of Appeals for the Second Circuit (Damages for Appeal for Delay), the Court noted that "Judge Palmieri concluded that the comments of the majority opinion were well substantiated by the record and that the reasoning and conclusions of the

27. In Steelworkers v. Warrior & Gulf Navigation Co., n. 26, *supra*, a companion case to the *Enterprise* decision, the Court commented that because the issues involved the special policies underlying Congressional recognition of labor arbitration, "the run of arbitration cases, illustrated by Wilko v. Swan, [346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168] becomes irrelevant to our problem." 363 U.S. at 578, 80 S.Ct. at 1351. However, the context of the statement indicates that the Court was concerned with making clear that the "hostility evinced by courts toward arbitration of commercial agreements has no place here." *Id.* Thus, *Wilko's* meaning in its proper sphere of application was not lessened, and the Court agrees with the statement of the Ninth Circuit in *Saguenay Terminals* that the language of *Enterprise Wheel & Car* "would be considered generally applicable to any arbitration." 293 F.2d at 801, n. 5.

28. The Supreme Court stated in *Enterprise* that arbitrators need give no reasons for their decision. 363 U.S. at 598, 80 S.Ct. at 1361. However, this Court is not prepared to read such a rule as to excuse failure to give reasons akin to findings of ultimate fact to sustain a decision subject to overriding federal statutes.

29. *Cf.* Evans v. Hudson Coal Co., 165 F.2d 970 (3d Cir. 1948) (decided before *Wilko;* arbitration was compelled pursuant to agreement in a suit to recover payments due under the Fair Labor Standards Act, 29 U.S.C. §§ 207(a) and 216(b). "A new, proper and legal formula to replace that presently contained in Section 7 [of the labor contract] must be arrived at by the Board of Conciliation * * *. But if the arbitration process proceeds to an award which is not in accordance with the provisions of the Fair Labor Standards Act or any other applicable statute, Sections 10 and 11 of the Arbitration Act provide means for its vacation, rehearing, modification or correction. The court below will be open for those ends." 165 F.2d at 974.

30. *See* Torrington Co. v. Metal Products Workers Union Local 1645, 362 F.2d 677 (2d Cir. 1966) ("[W]e have plainly intimated that the arbitrator's authority to render a given award is subject to meaningful review", 362 F.2d at 680) ; Local 453, Intern. Union of Electrical Workers v. Otis Elevator Co., 314 F.2d 25 (2d Cir.), cert. denied, 373 U.S. 949, 83 S.Ct. 1680, 10 L.Ed.2d 705 (1963) (district court was incorrect in applying public policy to vacate award reinstating employee who had been convicted of gambling offense ; "when public policy is sought to be interposed as a bar to enforcement of an arbitration award, a court must evaluate its asserted content." 314 F.2d at 29) ; *Cf.* F & M Schaefer Brewing Co. v. Local 49, International Union of United Brewery Workers of America, 420 F.2d 854, 856 (2d Cir. 1970) (court ordered submission to arbitration notwithstanding claim that issue to be arbitrated was outside scope of collective bargaining agreement; in applying *Torrington* test court could receive "benefit of the arbitrator's interpretative skills as to * * * his contractual authority", citing *Torrington,* 362 F.2d at 680, n. 6).

majority indicated that they went well out of their way to avoid [the result of which appellant complained]." 356 F.2d at 191.

## IV.

Thus, the Court has determined to remand the controversy to the arbitration panel pursuant to the Court's authority under §§ 10(d) and 10(e) of the Federal Arbitration Act, 9 U.S.C. §§ 10 (d), 10(e), upon the ground that under the award as it presently reads the arbitrators powers were "so imperfectly executed that a mutual, final, and definite award upon the subject matter submitted was not made."

So ordered.

### On Motion for Reargument

Respondent has moved for reargument and requests the Court to certify issues of law herein for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The Court's decision of November 17, 1971, sought to be reviewed, remanded this controversy to the arbitrators who rendered a decision for the respondent without any indication of the basis therefor.

 In order to grant a § 1292(b) certificate, the District Court must find that a controlling question of law is involved in the order sought to be appealed, that "there is substantial ground for difference of opinion" as to that question, and that "an immediate appeal . . . may materially advance the ultimate termination of the litigation."

Petitioner, who opposes the requested certification, argues that there is no sub-stantial ground for disagreement as to a District Court's power under the Federal Arbitration Act to remand a claim to the arbitrators who heard it "for clarification of their decision." While petitioner has cited several decisions which ordered or upheld such a remand and whose language may support the decision here [1], the Court is inclined to agree with respondent that the law involved is rather ambiguous and that there are substantial grounds for disagreement as to whether in a federal securities act situation the law imposes upon arbitrators an obligation to furnish some explanation of the ultimate findings embodied in their decision.

 The decisions of this Circuit generally do not favor liberal use of interlocutory appeals under § 1292(b), reserving that mechanism only for the exceptional case. Gottesman v. General Motors Corp., 268 F.2d 194, 196 (2d Cir. 1959) (power to certify "must be strictly limited to the precise conditions stated in the law". *But cf.* Moore, J., dissenting at 198–199); Leighton v. N. Y. Susquehanna & Western R. Co., 306 F. Supp. 513, 515 (S.D.N.Y.1969) (refusing to certify issues as to liability in suit for attorney's fees after trial on liability and before trial on damages).

In Bobolakis v. Compania Panamena Maritima San Gerassimo, 168 F.Supp. 236 (S.D.N.Y.1958), Judge Kaufman expressed the following observations as to the scope of § 1292(b):

The basis for the request seems to be that this case is an important one, in the sense that the law applicable to

1. In Galt v. Libbey-Owens-Ford Glass Co., 397 F.2d 439 (7th Cir.), cert. denied sub nom. F. H. Sparks Co., Inc. v. George Sollitt Construction Co., 393 U.S. 925, 89 S.Ct. 258, 21 L.Ed.2d 262 (1968), an arbitration between a subcontractor and its general contractor, the Court of Appeals affirmed remand of an award for the subcontractor in order to obtain the arbitrators' explanation of whether a payment clause in the subcontract—which provided that monies due to a subcontractor be paid out of funds received by the general contractor from the property owner—had been found to be within the scope of the contract's arbitration clause and had figured in the panel's decision. "Because the award did not mention the payment clause, even though that was one of the defenses presented to the arbitrators . . ., the award was not definite within the meaning of Section 10(d) of the Act. . . . [The remand] commendably avoided any judicial guessing as to the meaning of the award." *Id.* at 442.

many other cases will be in doubt until the issue passed on in Bobolakis is finally decided by the Court of Appeals. . . . There is nothing in the language of the statute or its legislative history to support the view that Congress intended to establish something akin to a 'certiorari' policy for the Courts of Appeals whereby 'important' cases would receive special appellate treatment. . . . [A] party cannot avail himself of the statute unless he shows that the appeal would save him from the cost and delay of protracted and expensive litigation. Id. at 239–240.

The propriety of the remand order is not a "controlling question", in the sense of possessing a dispositive impact on the litigation, since a contrary result in the Court of Appeals would not end this case but only return it to this Court for determination of the underlying claim that the award should be vacated. If the controlling question requirement is to be subsumed within the determination that interlocutory appeal would materially advance the termination of the litigation, as suggested by Professor Moore, 9 Moore's Federal Practice ¶ 110.22 [2] at 260 (2d ed. 1970), see United States v. Woodbury, 263 F.2d 784, 787 (9th Cir. 1959), S.E.C. v. Quing N. Wong, 254 F.Supp. 66, 68 (D.P.R.1966), it may well seem that receipt of a statement at this stage from the arbitrators and final determination of the motion to vacate their Award will be more expeditious than an interruption during the time necessary for application to the Court of Appeals, and hearing and determination if the appeal is allowed.

However, the effect of an interlocutory appeal on final termination of a controversy involves more than mere chronological calculations. The possibility of practical prejudice if the movant is not given an opportunity to seek appeal, which is all the District Court's certification grants him, may, under certain circumstances, be an appropriate factor for consideration. Shawe v. Wendy Wilson, Inc., 25 F.R.D. 1, 6–7 (S.D.N.Y.), rev'd on other grounds after certification accepted, 282 F.2d 508, 509 n. 1 (2d Cir. 1960). Cf. Gillespie v. U. S. Steel Corp., 379 U.S. 148, 153–54, 85 S.Ct. 308, 13 L.Ed.2d 199 (1964). Here, in the event of an ultimate decision in favor of petitioner, on subsequent appeal it would be difficult to restore the condition of the record prior to the remand to the arbitrators. Once it is known what the arbitrators say in response to the remand, there would be a fusion of the effect of the remand and the case as originally presented. Any possible prejudicial effect of a remand to which petitioner was ultimately found not to have been entitled can best be avoided by opening the way for an appeal now. On the other hand, an ultimate decision sustaining the validity of the Award would moot any objection to the remand.

Moreover, as the respondent indicates, the Court's ruling possibly may have widespread ramifications for the conduct of arbitration generally, and hence it may be in the interest of justice to present the Court of Appeals with an opportunity to consider and answer the questions raised at the moment in the litigation when they may be most clearly framed. The Court of Appeals has indicated that the unsettled nature of the law dealt with in an interlocutory decision may be a factor in its decision to accept an interlocutory appeal, Goldlawr, Inc. v. Heiman, 273 F.2d 729, 731 (2d Cir. 1959), certification accepted and appeal determined, 288 F.2d 579 (2d Cir. 1961), rev'd on other grounds, 369 U.S. 463, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962); Ross v. Bernhard, 403 F.2d 909, 910 (2d Cir. 1970), rev'd on other grounds, 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970) (certification granted on issue of right to jury trial in stockholders' derivative action because "there is a difference of views in the district court on this question.")

Accordingly, the Court has determined to certify that its opinion of November 17 involves a controlling question of law as to which there is substan-

tial ground for difference of opinion, namely whether an arbitration award in a case involving federal securities law standards which fails to provide some indication of the basis of the arbitration panel's decision may be set aside and resubmitted to the arbitration panel pursuant to 9 U.S.C. §§ 10(d) and (e), and that an immediate appeal from the decision may materially advance the ultimate termination of this litigation.[2]

Motion for reargument is granted, and, upon reargument, the decision is supplemented in accordance herewith. Settle Order on Notice.

2. In Northland Paper Co. v. Mohawk Tablet Co., 271 F.Supp. 763 (S.D.N.Y.1963) Judge Tyler granted certification and stated in language which is apposite here that "The granting of defendant's motion should not be construed as an imprimatur of the quoted language which defendant in its notice of motion asks this court to adopt." 271 F.Supp. at 769.