**Nelson Bunker HUNT, Plaintiff,**

v.

**MOBIL OIL CORPORATION et al.,
Defendants.**

**No. 75 Civ. 1160.**

United States District Court,
S. D. New York.

Nov. 5, 1975.

On Motion for Certification
March 2, 1976.

See also D.C., 410 F.Supp. 4.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Philip J. Hirschkop, Philip Hirschkop & Associates, Ltd., Alexandria, Va., for plaintiff; Jay H. Topkis, Daniel P. Levitt, Anthony M. Radice, Paul D. Wexler, Kenneth Berlin, New York City, of counsel.

Howrey & Simon, Washington, D. C., for defendant Mobil Oil Corp.; Edward F. Howrey, A. Duncan Whitaker, Mark D. Wegener, Washington, D. C., J. Edward Fowler, Richard H. Zahm, S. J. Bird, Juliet Shephard, New York City, of counsel.

Kaye, Scholer, Fierman, Hays & Handler, New York City, for defendant Texaco, Inc.; Milton J. Schubin, Charles F. Kazlauskas, Jr., G. Kenneth Handley, Jr., Lawrence R. Jerz, Texaco, Inc., New York City, of counsel.

Lord, Day & Lord, New York City, Pillsbury, Madison & Sutro, San Francisco, Cal., for defendant Standard Oil Co. of California; Gordon B. Spivack, John W. Castles, 3d, Harry G. Sklarsky, David H. Marks, Carolyn Ellis, New York City, Turner H. McBaine, Wallace L. Kaapcke, Thomas E. Haven, San Francisco, Cal., of counsel.

Shea, Gould, Climenko & Kramer, New York City, for defendant The British Petroleum Co., Ltd.; Bruce A. Hecker, Joseph Ferraro, New York City, of counsel.

Sullivan & Cromwell, New York City, for defendant Exxon Corp.; Robert MacCrate, Robert M. Osgood, Barbara A. Mentz, New York City, of counsel.

Frank W. Morgan, Frank R. O'Hara, Gulf Oil Corp., Ralph Dorius, Pittsburgh, Pa., for defendant Gulf Oil Corp.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for defendant Occidental Petroleum Corp.; Louis Nizer, Walter S. Beck, New York City, of counsel.

Leo Larkin, Morris Handel, Grace Petroleum Corp., New York City, for defendant Grace Petroleum Corp.

Windels & Marx, New York City, for defendant Gelsenberg A.G.

OPINION

EDWARD WEINFELD, District Judge.

Certain defendants (Mobil Oil Corporation, Texaco, Inc., Standard Oil Company of California, The British Petroleum Company, Ltd., Exxon Corporation, Gulf Oil Corporation, Occidental Petroleum Corporation, Grace Petroleum Corporation), excepting only defendants Shell Petroleum Company, Ltd. and Gel-

senberg AG,[1] move to dismiss the first, second and third claims of the complaint, encompassing all of plaintiff's antitrust charges, for lack of subject matter jurisdiction and for failure to state claims upon which relief can be granted, pursuant to Rule 12(b)(1)[2] and (6) of the Federal Rules of Civil Procedure. The defendants also move to dismiss the fourth claim, which alleges a breach of contract, or for partial summary judgment thereon; alternatively, they seek an order pursuant to section 3 of the Federal Arbitration Act[3] staying all proceedings under the fourth claim pending arbitration thereof.

■ At the outset a preliminary observation is in order. The defendants' motion to dismiss is based solely upon the alleged deficiencies of plaintiff's complaint, to which is attached an agreement of the parties and related amendments and supplements. The movants, however, in somewhat discursive fashion, have directed part of their argument to the merits of plaintiff's claims. This makes it necessary to state, what ordinarily is accepted as hornbook law, that the merits of the claims set forth in the complaint are not at issue; that the allegations of the complaint are assumed to be true for the purposes of this motion;[4] further, that a complaint should not be dismissed unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[5]

## THE ANTITRUST CLAIMS

Plaintiff Hunt, who was engaged in oil production in Libya under a government concession, alleges three claims of violation of the antitrust laws by the defendants. In broad outline, he charges that prior to and in the course of cooperative efforts by plaintiff and defendants to deal with increasingly aggressive oil producing countries, defendants combined and conspired in violation of section 1 of the Sherman Act[6] and section 73 of the Wilson Tariff Act:[7]

1. The defendant Gelsenberg AG moved to dismiss the complaint for lack of in personam jurisdiction and for lack of proper service of process, which motion was denied.

2. The precise basis for the claim of lack of subject matter jurisdiction is not altogether clearly articulated by the defendants. Upon argument of the motion, counsel for defendants stated that both branches of the instant motion would be treated the same, to wit, as "failure to state a claim." In any event, the defendants' challenge for lack of subject matter jurisdiction is without substance. As the Court of Appeals indicated recently, in *Brault v. Town of Milton*, Docket No. 74–2370 (2d Cir., Aug. 22, 1975), "[s]ince plaintiff [has] drawn [his] complaint so as to seek recovery under the . . . laws of the United States, this court has jurisdiction to hear the case, even if the complaint ultimately fails to state a claim." In *Baker v. Carr*, 369 U.S. 186, 199, 82 S.Ct. 691, 700, 7 L.Ed.2d 663 (1962), the Supreme Court held that such a suit may be dismissed for want of jurisdiction of the subject matter only if the alleged claim under the federal statute is "'so attenuated and unsubstantial as to be absolutely devoid of merit' . . . or 'frivolous.' . . ." The plaintiff's complaint here does not fall within this narrow exception to the rule, originating in *Bell v.*

*Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946), that "[j]urisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover."

3. 9 U.S.C. § 3.

4. *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 515–16, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 174–75, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965).

5. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957), *reaff'd, Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L.Ed.2d 90 (1974). *See also Prudential Ins. Co. of America v. Insurance Agents' Int'l Union (AFL–CIO)*, 169 F. Supp. 534, 536 (S.D.N.Y.1959).

6. 15 U.S.C. § 1. This section reads as follows:
"Every contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

7. 15 U.S.C. § 8. This section reads as follows:

*Claim 1:* to impose unlawful customer and market restrictions upon him by insisting he enter into an agreement, thereafter enforced, which limited the resale of Persian Gulf oil supplied to him by defendants only to his preexisting Western Hemisphere and European customers.

*Claim 2:* to group boycott plaintiff by collectively refusing to deliver to him some ninety million barrels of oil rightfully due him under that agreement.

*Claim 3:* to use the agreement between the parties, as amended and extended, and their consequent control over the course of Libyan negotiations, to promote certain defendants' Persian Gulf interests at the expense of plaintiff and, ultimately, to destroy plaintiff by preventing him from reaching any agreement with the Libyan government, which course of action led to plaintiff's nationalization and elimination from competition as a producer of Libyan oil. Such concerted misuse of the parties' agreement was allegedly the continuance of an already existing conspiracy on the part of the defendant seven major oil companies [8] to eliminate plaintiff and other Libyan independents as competitors.

Preliminary to a detailed consideration of the defendants' challenge to these claims, a brief reference is desirable to the extended factual background against which the claims are alleged. The plaintiff's charges center about oil production in two areas, Libya and the Persian Gulf. Libya and the other oil producing countries are members of the Organization of Petroleum Exporting Countries ("OPEC"). The seven majors are vertically integrated.[9] Six of the seven produce oil in both areas, but the Persian Gulf fields are far more significant to them since this area contains ten times the oil in Libya. Plaintiff was a non-integrated independent producer who operated in Libya at exploration and production levels. Other independent producers of oil in Libya were Occidental Petroleum Corporation, Gelsenberg AG, a West German corporation, and Grace Petroleum Corporation, also named herein as defendants.

Plaintiff alleges that as production of oil in Libya by him and other independents increased substantially, the domination by the seven majors of world trade in crude oil was threatened, and that as the non-majors expanded their share of Libyan production, attempts were made as early as 1965 by one or more majors to eliminate cost advantages enjoyed by the non-majors' fast increasing Libyan production over the majors' Persian Gulf production.

In late 1969 Libya threateningly demanded changes in existing agreements with oil companies operating in Libya which increased the government's share or "take" in these companies' profits from such oil production. Libya's success in enforcing such terms in its 1970 agreements with all Libyan producers prompted the Persian Gulf countries to make similar demands on the companies operating in their territories. Following formulation of these Persian Gulf demands in December 1970, Libya, early in January 1971, despite recently concluded agreements, demanded new price

---

"Every combination, conspiracy, trust, agreement, or contract is declared to be contrary to public policy, illegal and void when the same is made by or between two or more persons or corporations, either of whom, as agent or principal, is engaged in importing any article from any foreign country into the United States, and when such combination, conspiracy, trust, agreement, or contract is intended to operate in restraint of lawful trade, or free competition in lawful trade or commerce . . . ."

8. Mobil Oil Corporation, Exxon Corporation, Shell Petroleum Company, Ltd., · Texaco. Inc., Standard Oil Company of California, The British Petroleum Company, Ltd. and Gulf Oil Corporation.

9. Their functions include the exploration for and production of crude oil, the refining of crude oil, the transportation of crude oil and of refined petroleum products, and the marketing of refined petroleum products.

and tax increases, particularly from plaintiff Hunt and from defendant Occidental, and gave them until January 16, 1971 to accept these "non-negotiable demands." Fearing a continuation of this pattern of escalating demands by Libya and then by Persian Gulf countries ("leapfrogging," as the parties term it), executives of the seven majors met secretly in January 1971 to concert their response to the latest demands of Libya, OPEC and the Persian Gulf members of OPEC.

Originally, the seven majors did not include plaintiff or any of the other Libyan independents in their conferences or plans to present a united front in resisting the demands of the oil producing countries, although their immediate concern was the prospect of escalation of Persian Gulf countries' demands if either Hunt or Occidental agreed to Libya's new terms. The seven majors sought a clearance letter from the Department of Justice, but the Department insisted upon the inclusion of the independent Libyan oil producers as a condition of stating it had no present intention to bring an enforcement proceeding under the antitrust laws by reason of the contemplated concert of action by the seven majors. Plaintiff alleges that for this reason he and the other independents were belatedly invited to participate in the sessions. Plaintiff further alleges that another purpose of the seven majors in admitting Hunt and the other Libyan producers to their meetings was to obtain control over them in order to prevent any of them from accepting any terms laid down by Libya which might set an undesirable precedent for negotiations with the Persian Gulf countries, where the seven majors had their principal interest, or from otherwise acting in conflict with the interests of the seven majors.

Hunt alleges that at these meetings the parties resolved to present a united front in dealing with Libya and the other OPEC countries and despite his objections to some of the key features of the proposed agreement, he acquiesced based upon assurances by the parties that they would support him by supplying him with oil if his own supply were cut off by Libya. In any event, plaintiff and the defendants reached an agreement on January 15, 1971, referred to as the Libyan Producers' Agreement (the "Agreement"), which is at the core of this litigation.

The clear purpose of the Agreement, acknowledged by all the parties, was to deal collectively with the demands of Libya and the other oil producing countries. Each party to the Agreement declared his or its intention not to make any agreement or offer of agreement with the Libyan government with respect to the "government take" of crude oil without the consent of the other parties, and to endeavor before making any agreement with the Libyan government to include a requirement that the Libyan government deal with the other concessionaires on comparable terms.[10]

A principal feature of the Agreement was its "sharing" provision. In general, the Agreement provided that if the party's crude oil production in Libya was cut back as a result of government action, all other parties would share in such cut back as provided in the Agreement. And if there was insufficient Libyan oil to meet the contractual obligations due to restrictions or shut down by the Libyan government, those parties with Persian Gulf production would supply the Libyan producers who were cut back with Persian Gulf oil at cost. However, this obligation was limited to supply such Persian Gulf oil only to

10. However, ¶ 1 of the Agreement provides: "[N]othing . . . shall obligate any company to take or refrain from taking any ac-

tion if to do so would, in its opinion, be contrary to its vital interests."

meet commitments to preexisting European and Western Hemisphere customers.[11] Plaintiff Hunt had three such customers at that time, all of whom were signatories to the Agreement, and two of whom were among the seven majors (Exxon and Shell).

Plaintiff alleges that despite his objections to certain aspects of the Agreement, particularly to the preexisting customer and market restriction clause, he signed the Agreement for a number of reasons: the pressure of the January 16 deadline set by Libya for response to its latest "Non-negotiable" demands; the fact that industry-wide and OPEC-wide negotiations were preferable to individual negotiations with Libya; a misplaced confidence in the good faith and expressed intention of the other parties, and the fear that he would be boycotted if he refused to sign.[12]

## THE FIRST ANTITRUST CLAIM

(a) *The preexisting customer provision.*

Plaintiff Hunt in essence charges that defendants, horizontal competitors of each other and of Hunt, violated the antitrust laws by the provision of the Agreement that imposed upon him a restriction against the resale of Persian Gulf oil to any other than a preexisting European or Western Hemisphere customer, with the purpose and intended effect of foreclosing him from competing with defendants for new customers or in new markets. He further charges that he was the only party to the Agreement without refining capacity of his own, which the parties knew; that he had only three eligible or preexisting customers, all of whom were parties to the Agreement; that the effect of confining him to those customers was not only to foreclose him from seeking new customers wherever located, but also to enable the three to deal with him free from competitive forces and thus to extract from him wholly uncompetitive prices. Plaintiff contends that as a result of these acts and conduct of the defendants he sustained a loss of many millions of dollars.

On its face plaintiff's charge that the customer and market restrictions contained in the Agreement constituted a per se violation of the Sherman Act and the Wilson Tariff Act appears to be of substance under the Supreme Court decisions in *United States v. Arnold, Schwinn & Co.*[13] and *United States v. Topco Associates, Inc.*[14] In sum, plaintiff's position is that no matter how well intentioned and whatever the defendants' motivation in seeking to protect themselves against the ever increasing demands of the oil producing countries, the provision of the Agreement which restricted plaintiff to preexisting customers and geographical territories, in effect, a regulation of customers to whom and where he could sell crude oil, constitued a per se violation which forecloses application of the rule of reason.[15]

However, the defendants challenge the very foundation of this antitrust claim by raising the threshold question of whether the agreement to

---

11. This preexisting customer provision did not apply to any Libyan oil supplied to a producer who had been cut back.

12. Plaintiff's consent to and participation in the Agreement of which he now complains does not prevent him from seeking the protection of the antitrust laws since the Supreme Court has held that "the doctrine of *in pari delicto* . . . is not to be recognized as a defense to an antitrust action." *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 140, 88 S.Ct. 1981, 1985, 20 L.Ed.2d 982 (1968). *See also Trebuhs Realty v. News Syndicate Co.*, 107 F.Supp. 595, 599–601 (S.D.N.Y.1952).

13. 388 U.S. 365, 382, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967).

14. 405 U.S. 596, 607–11, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972).

15. *Cf. United States v. Topco Associates, Inc.*, 405 U.S. 596, 607–11, 92 S.Ct. 1126 (1972).

provide Persian Gulf oil to the parties whose supply was cut off by Libya was truly an agreement for the sale and purchase of oil, or whether it was in effect an insurance or risk allocation mechanism which by its very nature did not entail a restraint of trade subject to the antitrust laws. Among other matters, they argue that the preexisting customer clause under which oil was supplied to plaintiff was not an agreement to buy or sell, but rather "a sharing in the loss arrangement," of special benefit to plaintiff, since he was one of the most vulnerable of the parties to attack by Libya. Accordingly, defendants contend that the preexisting customer clause attached to the oil supply provision is beyond the proscription of the Sherman Act. Whatever the force of this contention, it goes to the merits of the parties' respective positions. Thus the issue is not one to be decided on a motion to dismiss, since its resolution requires an interpretation of the contract and the circumstances surrounding its execution.[16]

A matter of significance which would have to be considered is the so-called option to the Persian Gulf suppliers to pay cash in lieu of supplying oil. Under this provision, upon its face, the Persian Gulf producers who were "obligated to supply but [have] not supplied" such oil were permitted to pay cash to those Libyan producers whose supply had been cut off.[17] However, as the court noted at the argument of the motion to dismiss, this option provision "is rather clear except for one item at the end," [18] which reads: "[E]ach of the Persian Gulf Producers Parties states its present intention is to supply Persian Gulf crude oil in discharge of its obligations under paragraphs 2(e) and 3." When questioned upon argument as to the meaning of that provision of the contract, counsel for the movants replied that it "has no meaning except an expression of intention which they [the Persian Gulf suppliers] were free to ignore at any time." Presumably its inclusion had some purpose; [19] otherwise if the Persian Gulf producers had "no present intention . . . to supply Persian Gulf crude oil in discharge" of their obligations, a substantial question of fraud may come into play.[20]

The plaintiff, in the light of this and other provisions and circumstances surrounding the making of the Agreement, disputes defendants' position that the parties intended the option to pay cash to be a complete alternative, unlimited in scope or duration, to supplying oil. Apart from these contentions, plaintiff points to the fact that the supply clause also provides that the exercise of the option must apply pro rata to every party to whom the Persian Gulf parties owe oil, and if they supplied oil to one obli-

16. *Pekar v. Local No. 181 of the International Union of United Brewery, Flour, Cereal, Soft Drink and Distillery Workers of America, AFL–CIO*, 311 F.2d 628, 636 (6th Cir. 1962) ; *Machen v. Johansson*, 174 F.Supp. 522, 527 (S.D.N.Y.1959) ; *Farrand Optical Co. v. United States*, 107 F.Supp. 93, 96 (S.D.N.Y.1952).

17. Paragraph 4 of the Agreement provides in pertinent part:

"In respect of each barrel of Persian Gulf crude oil a party is obligated to supply but has not supplied under paragraph 2(e) or 3:

(a) Such party shall have the option to elect to pay 10 cents ; provided if such option is elected it shall apply pro rata as to every party to whom such Persian Gulf Producing Party has such an obligation."

18. Transcript of hearing, July 15, 1975, p. 79.

19. *National Equip. Rental Ltd. v. Reagin*, 338 F.2d 759, 762–63 (2d Cir. 1964). *See also Hanley v. James McHugh Const. Co.*, 444 F.2d 1006, 1009 (7th Cir. 1971) ; *United States v. N. A. Degerstrom, Inc.*, 408 F.2d 1130, 1133 (9th Cir. 1969).

20. *Deyo v. Hudson*, 225 N.Y. 602, 611–12, 122 N.E. 635 (1919) ; *Adams v. Gillig*, 199 N.Y. 314, 319–22, 92 N.E. 670 (1910). *See also Schenley Distillers Corp. v. Renken*, 34 F.Supp. 678, 680–82 (E.D.S.C.1940) ; *Terris v. Cumminskey*, 11 A.D.2d 259, 261, 203 N.Y.S.2d 445 (3d Dep't 1960) ; *Sabo v. Delman*, 3 N.Y.2d 155, 160, 164 N.Y.S.2d 714, 143 N.E.2d 906 (1957).

gee, they were without power to enforce a cash option provision against another obligee. Moreover, the payment of cash instead of supplying oil could, in the instance of the plaintiff, whose supply of Libyan oil was completely cut off, effectively eliminate him as a competitor in the crude oil market. Thus, the defendants' contention that the plaintiff's first claim is beyond the reach of the antitrust laws involves questions of fact which cannot be resolved on a motion to dismiss for failure to state a claim.[21]

The defendants, assuming arguendo that the Agreement at issue is covered by the Sherman Act, make a further attack upon plaintiff's first claim (as well as his other antitrust claims) upon a variety of grounds.

### (b) *The "target area" argument.*

■ Preliminarily, defendants urge that plaintiff lacks standing to raise any of his antitrust claims because he cannot, as required by the court in *Billy Baxter, Inc. v. The Coca-Cola Company,*[22] "allege a causative link to his injury which is 'direct' rather than 'incidental' or which indicates that his business or property was in the 'target area' of the defendant's illegal act."

In view of the fact that plaintiff was in direct competition with the defendants,[23] their contention is somewhat difficult to understand. To equate plaintiff's position to one whose alleged injury could be regarded only as "remote," "incidental" or "consequential" rather than "direct"[24] is to disregard the reali-

ty of the relationship of the parties and the allegations of the complaint. It is true, as defendants argue, that the "target" or objective of the collective efforts of the defendants was not the plaintiff, but rather the oil producing countries, as manifested by defendants' united front. However, plaintiff certainly was within the "target area" of the oil supply provision of their agreement, which is the crux of his first cause of action. Indeed, according to his claim as a competitor he was in the direct line of fire. Specifically, under his version of the facts, plaintiff charges that the preexisting customer clause was imposed not only over his protest, but was intentionally directed toward him for the very purpose of impairing his existing relationship with his customers and eliminating him from competition, causing him direct losses. Since plaintiff was not merely "incidentally" or "remotely" affected by this provision of the Libyan Producers' Agreement, as, for instance one of his customers or creditors might have been, the defendants' reliance upon the recently decided *Long Island Lighting Company v. Standard Oil Company of California* and *Consolidated Edison Company of New York v. Standard Oil Company of California*[25] is misplaced.

■ Defendants' related attack for lack of direct causal connection between their alleged unlawful conduct and plaintiff's claimed injury likewise must fail. Apart from the fact that the complaint does plead, in instance after instance, that plaintiff was damaged in that the

---

21. *Wolman r. Tose*, 467 F.2d 29, 35 (4th Cir. 1972) ; *Wilshire Oil Co. of Texas v. Riffe*, 409 F.2d 1277, 1284 (10th Cir. 1969) ; *Zell Ins. Agency, Inc. v. Guaranty Security Ins. Co.*, 399 F.2d 147, 148–49 (5th Cir. 1968) ; *Dobson v. Masonite Corp.*, 359 F.2d 921, 923–24 (5th Cir. 1966).

22. 431 F.2d 183, 187 (2d Cir. 1970), *cert. denied*, 401 U.S. 923, 91 S.Ct. 877, 20 L.Ed. 2d 826 (1971).

23. *Cf. Calderone Enterprises Corp. r. United Artists Theatre Circuit, Inc.*, 454 F.2d 1292, 1295 (2d Cir. 1971), *cert. denied*, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972),

where our Court of Appeals stated: "this court has committed itself to the principle that in order to have 'standing' to sue for treble damages under § 4 of the Clayton Act, a person must be within the 'target area' of the alleged antitrust conspiracy, i. e., a person against whom the conspiracy was aimed, *such as a competitor of the persons sued.*" (emphasis supplied.)

24. *Cf. Data Digests, Inc. v. Standard & Poor's Corp.*, 43 F.R.D. 386, 387 (S.D.N.Y. 1967).

25. 521 F.2d 1269 (2d Cir. 1975).

preexisting customer restriction foreclosed him from new customer and geographical markets, he charges that his existing customers, aided by other defendants and as part of their conspiratorial purpose, exploited the restrictions to force uncompetitive prices upon him, causing him to sustain losses in the millions. In any event, as this court has held, "the causation issue should not be resolved at this [pleading] stage of the action." [26]

*(c) The alleged inapplicability of the antitrust laws.*

▮ Here the defendants contend that the antitrust laws were never intended to apply to American companies in their dealings with a foreign government acting in its sovereign capacity. They rely upon the doctrine originally articulated in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,*[27] and further elucidated in *United Mine Workers of America v. Pennington,*[28] that:

> "the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly." [29]

The so-called *Noerr-Pennington* doctrine is founded upon the individual's constitutional right of petition under the First Amendment and upon the corresponding concern that the representatives in the legislatures retain access to the opinions of their constituents, unhampered by collateral regulation.[30] These interests are not present in plaintiff's first claim, since his primary concern is not with any action on the part of defendants to procure passage or enforcement of any law, but rather with the clause of the Agreement which contains the customer and market restriction which is a strictly "private commercial activity" expressly excluded from the immunity of *Noerr-Pennington* by the Court in *Continental Ore Company v. Union Carbide & Carbon Corporation.*[31]

(d) *The act of state doctrine.*

▮ Defendants also urge that plaintiff's first claim, as well as his two other antitrust claims, are foreclosed by the act of state doctrine. This doctrine was originated in *Underhill v. Hernandez,*[32] and precludes judicial inquiry into the public acts of a foreign government within that sovereign's own territory. It is based on "[c]onsiderations of comity, and of the highest expediency," and particularly on the notion that "[i]t would be not only offensive and unnecessary, but it would imperil the amicable relations between governments, and vex the peace of nations, to permit the sovereign acts or political transactions of states to be subjected to the examination of the legal tribunals of other states." [33] The doctrine has been held by the Supreme Court to bar a claim for antitrust injury flowing from a sovereign's acts which were induced by or procured by the defendant in the action.[34] However, the concept has no bearing on plaintiff's first claim because resolution of the issues raised thereunder does not in any way require an inquiry into the judgment, the conduct or acts of the Libyan government, or any alleged conduct by the defendants which allegedly in-

26. *Data Digests v. Standard & Poor's Corp.,* 43 F.R.D. 386, 388 (S.D.N.Y.1967).

27. 365 U.S. 127, 136, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

28. 381 U.S. 657, 669–70, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

29. *Eastern R. R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 136, 81 S.Ct. 523, 529 (1961).

30. *Id.* 137–38, 81 S.Ct. 523.

31. 370 U.S. 690, 707, 82 S.Ct. 1404, 8 L.Ed. 2d 777 (1962).

32. 65 F. 577, 579 (2d Cir. 1895), *aff'd,* 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897).

33. *Id.* 579.

34. *American Banana Co. v. United Fruit Co.,* 213 U.S. 347, 357–58, 29 S.Ct. 511, 53 L.Ed. 826 (1909).

duced action by the Libyan government.[35] Rather, inquiry would be confined to the preexisting customer restriction contained in the parties' Agreement.[36]

Once again, defendants, by concentrating on the broad purposes of the Libyan Producers' Agreement to present a united front in meeting the ever increasing demands of Libya and the other oil producing countries, disregard that plaintiff's first claim is premised entirely under the particular provision of the Agreement which limits his resale of oil received from Persian Gulf producer defendants to particular markets and customers. That provision does not involve any question of Libyan conduct. At issue is the restriction contained therein and not the governmental acts of a foreign sovereign. Thus, the act of state doctrine is unavailable on defendants' motion to dismiss the first claim.

(e) *The "ancillary restraint" doctrine.*

■ In substance the defendants repeat and emphasize their contention that the Agreement, unlike the ordinary agreement for the purchase and sale of crude oil, was in effect a mutual assistance pact which served as protection for a Libyan producer whose production was cut back; that a preexisting customer was a condition precedent for such a Libyan producer to obtain Persian Gulf oil, which measured the obligation of the Persian Gulf producers to supply oil and limited their liability thereunder. Accordingly, defendants urge that the preexisting customer clause is ancillary to the Libyan Producers' Agreement and is reasonably necessary to the goals of that Agreement. This argument perforce acknowledges that restraints are

imposed, but even so, the defendants contend they are reasonable and immune from antitrust attack because they fall within the protection of the "ancillary restraint" doctrine. This concept, first articulated in *United States v. Addyston Pipe & Steel Co.*,[37] recognizes such a defense where the restraint is "merely ancillary to the main purpose of a lawful contract, and necessary to protect the covenantee in the enjoyment of the legitimate fruits of the contract, or to protect him from the dangers of an unjust use of those fruits by the other party."

The plaintiff responds that defendants' ancillary restraint contention is flawed in several respects. First, he argues that the preexisting customer clause, with its customer and territorial restraints, is unlawful per se, which renders the doctrine inapplicable in the light of *United States v. Arnold, Schwinn & Co.*[38] Plaintiff, further argues that the doctrine is unavailable to defendants since it presupposes the existence of a lawful contract. Plaintiff claims the Libyan Producers' Agreement was forced upon him by the seven majors in furtherance and continuance of a preconceived anti-competitive purpose and thus is unlawful.

Next, he argues that even assuming a lawful contract, the restraint was neither reasonable nor necessary since it went far beyond what was required for the protection of the Persian Gulf producers insofar as they were obligated to supply oil. The defendants contend that it was reasonably necessary in order to limit the Persian Gulf producers' risk as obligors under the oil supply provision.

**35.** *Cf. Occidental Pet. Corp. v. Buttes Gas & Oil Co.*, 331 F.Supp. 92, 110 (C.D.Cal.1971), aff'd per curiam, 461 F.2d 1261 (9th Cir.), cert. denied, 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221 (1972).

**36.** Insofar as plaintiff's first claim raises the issue of the manipulation of Libyan tax laws by the seven majors, or any one of them, this reference is clearly for the purpose of setting a background and is not relied on by plaintiff to prove his claim of unlawful restriction of markets and customers.

**37.** 85 F. 271, 282 (6th Cir. 1898), aff'd, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899).

**38.** 388 U.S. 365, 380–82, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1966). *See United States v. Glaxo Group Ltd.*, 302 F.Supp. 1, 10–11 (D. D.C.1969), rev'd on other grounds, 410 U.S. 52, 93 S.Ct. 861, 35 L.Ed.2d 104 (1973).

**22**

These differing contentions present an issue of fact which must await trial.

## THE SECOND ANTITRUST CLAIM

Under his second claim, plaintiff alleges that since at least 1970 the defendants and others engaged in a combination or conspiracy in violation of the antitrust laws;[39] that as part of their unlawful conduct, and acting in concert, they conspired to and did withhold ninety million barrels of crude oil to him under the Libyan Producers' Agreement; that they agreed to boycott him to deprive him of crude oil needed to fulfill his contracts with his customers. He further alleges that as a result of such group action he not only lost profits he would have made on the resale of the withheld oil, but also lost his existing contracts, opportunities for their renewal and access to new customers and markets; and finally that he was eliminated as a source of crude oil in the world crude oil market.

The defendants seek dismissal of this antitrust claim upon the same grounds, among others, which were advanced against the first claim. Substantially the same analysis which required rejection of those objections directs a similar result as to this claim. Thus, defendants advance the "target area," "act of state doctrine," and inapplicability of the antitrust laws, as well as other objections. Again defendants consider the Libyan Producers' Agreement only in its overall function to present a united front against OPEC countries, but ignore the specific provision of that Agreement upon which plaintiff centers his charge of antitrust activity by defendants. Here plaintiff is contesting the defendants' use or abuse of the oil supply provision as an instrument to further a conspiracy to eliminate him as a competitor, which he alleges was in ex-

istence before the Agreement was executed.

 Plaintiff, as in the first claim, is directly in the "target area" of this clause so that he has standing to charge that defendants' "refusal to deal" and the "group boycott," which also constituted a breach of the terms of their Agreement, were with the intent and effect of harming him. Plaintiff's "act of state" contention and the inapplicability of the antitrust laws, based upon the *Noerr-Pennington*[40] doctrine is as misdirected to this claim as it was to the first claim. Consideration of the supply provision of the Agreement and its claimed breach in furtherance of the defendants' alleged purpose to eliminate him as a competitor does not require inquiry into the acts of Libya or any other foreign state.

Defendants further contend, as they did under the first claim, that the oil supply provision is not a contract for the sale of oil, but merely an insurance or mutual help mechanism which does not impose an unreasonable restraint and thus is not subject to antitrust attack. But again, the validity of this contention centers about questions of fact as to this aspect of the Agreement, resolution of which is foreclosed on a motion to dismiss for failure to state a claim.

 Defendants raise an additional objection to the second antitrust claim. They assert that this claim is one for breach of contract for failure to deliver a balance of ninety million barrels of crude oil due under the Libyan Producer' Agreement, which does not give rise to an antitrust claim. But again defendants ignore the allegations of the complaint, which go much beyond a charge that each defendant reneged on its commitment to the plaintiff. The

---

39. 15 U.S.C. §§ 1, 8.

40. *Eastern R. R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 137, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961);

*United Mine Workers of America v. Pennington,* 381 U.S. 657, 669–70, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

defendants' contention that plaintiff "was denied access to oil by action of the Libyan government, not the defendants," [41] is simplistic. It is true that the nationalization of Hunt's concession by Libya deprived him of an oil supply, but in that event the defendants agreed to supply him with Libyan oil, and if that were unavailable, with Persian Gulf oil to meet commitments to his existing customers. Hunt's specific claim is that the Persian Gulf defendants, acting in concert with others, failed to live up to that obligation; that the withholding of the ninety million barrels due him was encompassed within the alleged conspiracy to boycott him and eliminate him as a competitor.

Whether plaintiff can support his charges and show that a group boycott existed, and that its nature and extent was such as to constitute a violation of the Sherman Act, presents an issue of fact, the resolution of which must await another day.

For all the above reasons, the defendants' motion to dismiss the first and second claims must be denied.

## THE THIRD ANTITRUST CLAIM

██ In this instance, too, plaintiff alleges that at least since 1970 the seven majors, along with others, named and unnamed, conspired or combined in violation of the Sherman Act and Wilson Tariff Act to preserve the competitive advantage of Persian Gulf crude oil relative to that of Libyan crude oil and to diminish competition from Libyan oil producers; that to effect this purpose they conspired to prevent plaintiff Hunt and other Libyan producers from reaching an agreement with the Libyan government inconsistent with this competitive advantage; that in furtherance thereof, after obtaining Hunt's consent to the Libyan Producers' Agreement, which contemplated united front negotiations with Libya and other OPEC countries, the seven majors abandoned the agreed upon collective policy and manipulated the course of the Libyan negotiations so as to advance their own interests to the detriment of Hunt; and generally that the defendants deliberately pursued a course of action which led to the nationalization of Hunt's concession in Libya and his elimination as a Libyan crude oil producer.

In the light of plaintiff's aforesaid charges, the defendants' "act of state" plea rests on a solid foundation. The manipulative course of conduct attributed to the seven majors following the signing of the Libyan Producers' Agreement centers about negotiations and dealings with, and action thereafter taken by, the Libyan government. Hunt charges that in consequence he was forced to enter into arrangements with the Libyan government that were detrimental to him and beneficial to the seven majors; his personnel were evicted by Libya from the Sarir Field upon his refusal, induced by the seven majors, to market British Petroleum's production from its half of the Sarir Field [42] which Libya had nationalized; his oil production was cut back fifty per cent by Libya; his right to produce and export oil was terminated, following his resistance, again based upon defendants' inducement, to Libya's demand for increased equity participation in his interests in Sarir; finally, all his assets were nationalized by Libya. The aforesaid claimed consequences of defendants' manipulative course of action all involve acts of the Libyan government which appear to be within the proscription of the act of state doctrine.

But Hunt seeks to avoid the impact of this doctrine upon several grounds. First, he argues the third claim "challenges no act by the Libyan government, and does not ask this Court to sit in judgment on the acts of a sovereign state. As pleaded, the wrong done to

---

41. Reply memorandum p. 7.

42. Hunt had the concession on the other half.

**24**

Hunt was caused prior to any act by the Libyan government, for it was caused when the defendants entered into a conspiracy to advance their own Persian Gulf interests at his expense and to eliminate him from the industry." Although it may be, as plaintiff asserts, that the alleged conspiracy originated late in 1970, the acts and conduct of the defendants in furtherance thereof were committed after the signing of the Agreement in January 1971. True, inquiry may be properly directed to the acts and conduct of the seven majors and their codefendants, allegedly constituting their manipulative course of action. But the matter does not end there. To establish his claim plaintiff would have to show that such acts and conduct were a material cause of his alleged damage;[43] that but for defendants' conspiratorial manipulative activities the Libyan government would not have cut back his production, shut off his oil supply completely and then nationalized his properties. This clearly would require inquiry into acts and conduct of Libyan officials, Libyan affairs and Libyan policies with respect to plaintiff's as well as other oil producers' properties and the underlying reasons for the Libyan government's actions.

In *Occidental Petroleum Corporation v. Buttes Gas & Oil Co.,*[44] the facts of which substantially parallel those of the instant case, plaintiff charged that the defendant had "induced and procured" various foreign governmental authorities to do certain executive acts which deprived plaintiff of its concession for oil production. The court found that the act of state doctrine, as set forth in *American Banana Company v. United Fruit Company,*[45] was the "relevant and dispositive principle."[46] The court specifically considered the contention, heavily relied upon by Hunt here, that the doctrine was inapplicable because plaintiffs were not complaining "of the acts of foreign states set forth in the complaint, but rather only of the defendants' conduct in 'catalyzing' those acts."[47] As a major item in rejecting plaintiffs' efforts to avoid the impact of the act of state doctrine, the court stated that "[b]ecause a private antitrust claim requires proof of damage resulting from forbidden conduct . . . plaintiffs necessarily ask this court to 'sit in judgment' upon the sovereign acts pleaded, whether or not the countries involved are considered co-conspirators."[48] The court followed *American Banana* and granted the defendants' motion to dismiss. Here the operative facts are even more strikingly similar to *American Banana* than they were in *Occidental,* since the foreign act of state complained of in *American Banana* was the nationalization of plaintiffs' production facilities.

Next, plaintiff urges that the Supreme Court, in *United States v. Sisal Sales Corp.*[49] and *Continental Ore Co. v.*

43. *Winckler & Smith Citrus Prods. Co. v. Sunkist Growers, Inc.,* 346 F.2d 1012, 1014 n. 1 (9th Cir.), *cert. denied,* 382 U.S. 958, 86 S.Ct. 433, 15 L.Ed.2d 362 (1965). *See also Credit Bureau Reports, Inc. v. Retail Credit Co.,* 476 F.2d 989, 992 (5th Cir. 1973) ; *Sam S. Goldstein Indus., Inc. v. Botany Indus., Inc.,* 301 F.Supp. 728, 733–34 (S.D.N.Y.1969) ; *National Auto Brokers Corp. v. General Motors Corp.,* 60 F.R.D. 476, 489–90 (S.D.N.Y.1973). Thus, the Supreme Court, in *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.,* 364 U.S. 656, 660, 81 S.Ct. 365, 5 L.Ed.2d 358 (1960), indicated that, in a private treble damage action under § 1 of the Sherman Act, plaintiff must adequately allege that he was "damaged" by the violation of the Act.

44. 331 F.Supp. 92, 107 (C.D.Cal.1971), *aff'd per curiam,* 461 F.2d 1261 (9th Cir.), *cert. denied,* 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed. 2d 221 (1972).

45. 160 F. 184 (C.C.S.D.N.Y.), *aff'd,* 166 F. 261 (2d Cir. 1908), *aff'd,* 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909).

46. *Occidental Petroleum Corp. v. Buttes Gas & Oil Co.,* 331 F.Supp. 92, 108 (C.D.Cal. 1971), *aff'd per curiam,* 461 F.2d 1261 (9th Cir.), *cert. denied,* 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221 (1972).

47. *Id.* 110.

48. *Id.*

49. 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042 (1927).

*Union Carbide & Carbon Corp.*,[50] created an exception to *American Banana*, which applies to his third claim. In *Sisal*, the Court explicitly distinguished *American Banana* on the ground that the conspiracy in *Sisal* was "made effective by acts done" within the United States and thus was not " '[a] conspiracy in this country to do acts in another jurisdiction,' "[51] as was the case in *American Banana* and is the case presently before this court. In *Continental Ore*, the Court rested its decision on similar grounds, but also emphasized that no "official within the structure of the Canadian Government"[52] was involved.

It may well be that recent public disclosure of the dealings of multi-national corporations with foreign governments which have an adverse impact upon American interests justifies a reappraisal of the act of state doctrine to determine whether its scope should be confined. However, in the absence of new doctrinal trends in Supreme Court opinions, reassessment of the range of the doctrine must rest with that Court and not this court.[53] Accordingly, the defendants' motion to dismiss the third claim is granted.

### THE BREACH OF CONTRACT CLAIM

Plaintiff alleges that defendants breached the Libyan Producers' Agreement by failing to supply him with ninety million barrels of Libyan and/or Persian Gulf crude oil due to him thereunder, and as a result he sustained damages of at least ninety million dollars.

All defendants move to stay all proceedings with respect to the breach of contract claim pending arbitration pursuant to the arbitration provision in the Agreement.[54] However, only one defendant, Texaco, has served a demand that the claim be submitted to arbitration. Thereupon plaintiff moved to stay Texaco's proposed arbitration pending determination of his antitrust claims, now reduced to two. That the fourth claim is subject to arbitration under the Agreement is beyond dispute. The issue, however, is whether that claim should be submitted to arbitrators for their determination at the same time that plaintiff's antitrust claims go forward in this court for judicial determination.

It is now cardinal doctrine that the public interest in the enforcement of the antiturst laws makes antitrust claims inappropriate subjects for arbitration.[55] As a corollary, a stay of antitrust judicial proceedings in favor of arbitration will not be granted where the arbitrators would be required to consider antitrust issues with respect to the controversy to be determined by them.[56] Thus the precise question presented by

50. 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).

51. *United States v. Sisal Sales Corp.*, 274 U. S. 268, 276, 47 S.Ct. 592, 593, 71 L.Ed. 1042 (1927).

52. 370 U.S. 690, 706, 82 S.Ct. 1404, 1414, 8 L.Ed.2d 777 (1962).

53. *Cf. United States v. Ullmann*, 221 F.2d 760, 761–62 (2d Cir. 1955), *aff'd*, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 (1956). *See also Booster Lodge No. 405, Int'l Ass'n of Machinists and Aerospace Workers, AFL–CIO v. National Labor Relations Bd.*, 148 U.S.App.D.C. 119, 459 F.2d 1143, 1150 n. 7 (1972); *United States Gypsum Co. v. United Steelworkers of America*, 384 F.2d 38, 44 (5th Cir. 1967), *cert. denied*, 389 U.S. 1042, 88 S.Ct. 783, 19 L.Ed.2d 832 (1968); *United States v. Finazzo*, 288 F.2d 175, 177 (6th Cir. 1961); *G. I. Distributors, Inc. v.*

*Murphy*, 336 F.Supp. 1036, 1037 (S.D.N.Y. 1972).

54. Paragraph 9(d) of the Agreement reads as follows: "Any controversy or claim arising out of or relating to this contract or the breach thereof shall be settled by arbitration . . . ."

55. *American Safety Equip. Corp. v. J. P. Maguire & Co.*, 391 F.2d 821, 827–28 (2d Cir. 1968). *See also Cobb v. Lewis*, 488 F. 2d 41, 47 (5th Cir. 1974); *Helfenbein v. International Indus., Inc.*, 438 F.2d 1068, 1070 (8th Cir.), *cert. denied*, 404 U.S. 872, 92 S. Ct. 63, 30 L.Ed.2d 115 (1971); *A. & E. Plastik Pak Co. v. Monsanto Co.*, 396 F.2d 710, 715–16 (9th Cir. 1968).

56. *American Safety Equip. Corp. v. J. P. Maguire & Co.*, 391 F.2d 821, 828 (2d Cir. 1968).

the respective motions is whether the antitrust issues so permeate the entire case that it would not be "easy for an arbitrator to separate the antitrust issues from the other issues in the case, and to proceed to decide the arbitrable issues without inquiry into the antitrust issues." [57]

The defendants argue that the arbitrator would not be required to resolve the antitrust claims and, by way of example, add "if questions were to arise as to the meaning of particular words or clauses in the contract, an arbitrator would be able to determine these matters without delving into antitrust issues." But the meaning of particular words or clauses in the contract is included among other issues the court would have to consider under the first and second antitrust claims.

■■■ The alleged breach of contract is an essential ingredient of plaintiff's second antitrust claim. The hard thrust of plaintiff's charge is that the withholding of ninety million barrels of oil due him under the supply provision was not only a breach of the Agreement, but also a concerted refusal to deal with him and a group boycott in furtherance of the conspiracy to eliminate him as a competitor. Thus what is at issue is not a mere breach of contract, which to be sure is within the competence of an arbitrator's determination and by itself, if isolated, would not involve antitrust issues. However, the court will have to decide whether a breach of the oil supply provision occurred, and if so, whether it was committed by defendants individually or acting in concert and with

the purpose and intent of eliminating him or injuring him as a competitor.

Also at issue are the parties' conflicting positions as to the option clause under the oil supply provision. The defendants contend that the option clause gave them an absolute, unrestricted right to pay cash instead of supplying oil. Obviously this would be advanced as a defense in the arbitration. Plaintiff's differing version that the payment of cash could not be used to freeze him out of oil to which he was entitled, and thereby to eliminate him as a competitor, is a central issue under the antitrust charge.

It is unrealistic to assert, as defendants do, that the breach of contract claim can be isolated so that the arbitrator can decide the issues thereunder without inquiry into matters that are material to the antitrust claims. The breach of contract and antitrust claims are so inextricably interrelated, one with the other, that it would not be easy, in the light of the parties' contentions, for the arbitrators to avoid wandering into the thicket of complex antitrust issues.

If anything, Texaco's demand for arbitration demonstrates that its purpose indeed is to have the arbitrator consider plaintiff's antitrust claims. The commencement of this very lawsuit and the assertion of the antitrust claims [58] are alleged by Texaco to constitute a breach of contract by Hunt, which Texaco asserts is arbitrable and which it seeks to submit to the arbitrator. Such a submission would require lay arbitrators to delve into whether or not the antitrust claims were foreclosed by the parties'

---

57. *Cobb v. Lewis*, 488 F.2d 41, 50 (5th Cir. 1974).

58. The second dispute presented by Texaco's demand is the following:

"2. You have breached the promise you made in the contract which induced Texaco to enter into the contract with you and upon which Texaco relied in conferring valuable benefits to you thereunder. The contract contains the following essential promise:

'Each party hereto covenants that it will not assert any claim against any other

party or parties arising out of this agreement, except claims for non-performance of this agreement.'

In *your aforementioned lawsuit*, [this action] you purport to assert claims against Texaco arising out of the contract for other than its non-performance, thereby breaching your covenant and depriving Texaco of the consideration for the valuable benefits Texaco delivered to you pursuant to the contract." (emphasis supplied.)

Agreement.[59] Texaco argues that Hunt violated the Agreement by commencing this antitrust suit. The argument proceeds:

"The issue before the arbitrators is not whether Hunt's customer provision claim may go forward. That unquestionably is a matter to be determined by this Court. Nor, of course, will the arbitrators be asked to determine the legality of the customer provision.

"The question the arbitrators will have is whether someone may scheme to exact property from another by promising not to bring a potential claim and, once the property is given to him in reliance on his promise, turn around and bring the claim anyway and still retain the benefits of his broken promise."

We are not prepared to apply an Alice in Wonderland meaning to this language. It so manifestly indicates that Texaco does intend to present to and have the arbitrators pass upon the issues which are the very essence of one of plaintiff's antitrust claims that one wonders the argument was advanced.

Accordingly, the plaintiff's cross-motion for a stay of Texaco's proposed arbitration of the breach of contract claim is granted; the motion by the other defendants for a stay of proceedings of the fourth claim in this action is granted except insofar as the breach of contract claim alleged therein is relevant and pertinent under the first and second antitrust claims; further, those defendants, as well as Texaco, are stayed from proceeding to arbitration as to the breach of contract claim until the final determination of this action.

Since the fourth claim is the subject of a stay both in this action and in arbitration, it is unnecessary to pass upon the alternative motion for its dismissal or partial summary judgment thereon.

In conclusion, the defendants' motion to dismiss is denied as to the first and second claims; granted as to the third claim; and the respective motions as to the fourth claim are disposed of as indicated.

**On Motion for Certification**

Defendant Exxon and other defendants move for a certification under 28 U.S.C., section 1292(b) to permit them to apply to the Court of Appeals for leave to appeal from this Court's order of November 5, 1975, denying their motions to dismiss the first and second claims of the complaint.

On January 22, 1976, this Court granted plaintiff's application for a Rule 54 (b) order directing the entry of final judgment of dismissal of plaintiff's third claim upon the single legal issue of the applicability of the "act of state" doctrine to that claim. Defendants argue that "it would be inequitable to permit plaintiff an unconditional right of review while at the same time denying defendants an opportunity to apply for an appeal." Under these circumstances, they assert that "basic fairness favors the allowance of this motion."

However, as defendants are well aware, the criterion for certification under Rule 54(b) is simply that "there is no just reason for delay" for the entry of judgment, which affords an absolute right of appeal, while section 1292(b) imposes upon this Court the affirmative duty to certify that an otherwise non-appealable order it has made "involves a controlling question of law as to which

59. An agreement to waive future antitrust violations would be contrary to public policy. *Gaines v. Carollton Tobacco Bd. of Trade, Inc.*, 386 F.2d 757, 759 (6th Cir. 1967); *Fox Midwest Theatres, Inc. v. Means*, 221 F.2d 173, 180 (8th Cir. 1955); *Westmoreland Asbestos Co. v. Johns-Manville Corp.*, 39 F.Supp. 117, 119 (S.D.N.Y.1941), aff'd, 135 F.2d 844 (2d Cir. 1943). On the other hand, the Court of Appeals has held that arbitration of antitrust claims is "proper . . . [when] the agreement to arbitrate was made after the dispute arose." *Coenen v. R. W. Pressprich & Co.*, 453 F.2d 1209, 1215 (2d Cir.), cert. denied, 406 U.S. 949, 92 S.Ct. 2045, 32 L.Ed.2d 337 (1972). See also *Cobb v. Lewis*, 488 F.2d 41, 48 (5th Cir. 1974).

there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." Our Court of Appeals has admonished that, because of the "limited and exceptional character of the cases" to which section 1292(b) applies, the Court's "power must be strictly limited to the precise conditions stated in the law."[1]

■ Defendants urge that the conditions of section 1292(b) are fully satisfied by the presence in the instant case of "a controlling question of law as to which there is substantial ground for difference of opinion" concerning the applicability of either the "target area" doctrine or the "act of state" doctrine to plaintiff's first and second claims. This Court does not agree. In its decision denying defendants' motion to dismiss as to these claims, this Court stated repeatedly that to apply either of these doctrines to bar plaintiff's first or second claim would be to "disregard the reality of the relationship of the parties and the allegations of the complaint."[2]

Plaintiff was found to have standing to raise these antitrust claims because he was "directly" in the "target area" of the defendants' allegedly unlawful activities. Defendants' reliance upon the recently decided *Long Island Lighting Company v. Standard Oil Company of California* and *Consolidated Edison Company of New York v. Standard Oil Company of California*,[3] which is reasserted in support of this motion, was

rejected as "misplaced" since plaintiff, as a direct competitor of defendants, "was not merely 'incidentally' or 'remotely' affected by [the] provision[s] of the Libyan Producers' Agreement, as, for instance, one of his customers or creditors might have been."[4]

As to the applicability of the "act of state" doctrine, this Court held that:

"[T]he concept has no bearing on plaintiff's first claim because resolution of the issues raised thereunder does not in any way require an inquiry into the judgment, the conduct or acts of the Libyan government, or any alleged conduct by the defendants which allegedly induced action by the Libyan government."[5]

Defendants' "act of state" contention was determined to be as "misdirected to [the second] claim as it was to the first claim" since consideration of that claim also "does not require inquiry into the acts of Libya or any other foreign state."[6]

This Court is "of the opinion" that its order denying defendants' motion to dismiss as to plaintiff's first and second claims does not involve any controlling question of law "as to which there is substantial ground for difference of opinion."[7] Accordingly, under the strict admonition of the Court of Appeals to rigorously adhere to the precise conditions of section 1292(b), this Court perforce must deny defendants' motion without considering the tendered issue of "basic fairness" to or convenience of the movants.

1. *Gottesman v. General Motors Corp.*, 268 F.2d 194, 196 (2d Cir. 1959). *See also Milbert v. Bison Laboratories, Inc.*, 260 F.2d 431, 433 (3d Cir. 1958); *Sobel v. Hertz, Warner & Co.*, 338 F.Supp. 287, 299 (S.D. N.Y.1971).

2. *Hunt v. Mobil Oil Corp.*, p. 19.

3. 390 F.Supp. 1172 (S.D.N.Y.1975).

4. *Hunt v. Mobil Oil Corp.*, p. 19.

5. *Id.* p. 20.

6. *Id.* p. 22.

7. 28 U.S.C. § 1292(b).